**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| V&A Collection, LLC, | Index No. |
| *Plaintiff,* | |
| -against- | **SUMMONS** |
| Guzzini Properties Ltd., | |
| *Defendant.* | |

TO THE ABOVE-NAMED DEFENDANT:

You are hereby summoned to answer the Complaint of V&A Collection, LLC (the "Collection"), a copy of which is herewith served upon you, together with copies of all prior pleadings in the action, and to serve copies of your answer upon the undersigned attorney for the Collection, within 20 days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or 30 days after completion of service where service is made in any other manner.  In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

The basis of venue is that (i) Guzzini filed a related action here, *see Guzzini Properties Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019, and therefore Guzzini has consented to venue in New York County for purposes of adjudicating its rights under the agreement at issue in the above-captioned action; and (ii) the Collection's members are New York residents.

Dated: February 26, 2020
New York, New York

**GROSSMAN LLP**

By: _____

Judd B. Grossman, Esq.
jgrossman@grossmanllp.com
Lindsay E. Hogan, Esq.
lhogan@grossmanllp.com
Sarah E. Schuster, Esq.
sschuster@grossmanllp.com
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997

*Attorneys for V&A Collection, LLC*

To:     Wendy J. Lindstrom, Esq.
MAZZOLA LINDSTROM LLP
733 Third Avenue, 15th Floor
New York, New York 10017
(t): (646) 216-8300
wendy@mazzolalindstrom.com

*Attorneys for Guzzini Properties Ltd.*

Judd B. Grossman, Esq.
Lindsay E. Hogan, Esq.
Sarah E. Schuster, Esq.
**GROSSMAN LLP**
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997
jgrossman@grossmanllp.com
lhogan@grossmanllp.com
sschuster@grossmanllp.com

*Attorneys for V&A Collection, LLC*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| V&A Collection, LLC, | Index No. |
| *Plaintiff*, | |
| -against- | **VERIFIED COMPLAINT** |
| Guzzini Properties Ltd., | |
| *Defendant*. | |

Plaintiff V&A Collection, LLC (the "Collection"), by and through its undersigned attorneys, for its Complaint against Defendant Guzzini Properties Ltd. ("Guzzini"), states as follows, on knowledge as to itself and on information and belief as to all other matters, which are likely to have evidentiary support after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1. This action arises out of a title dispute involving a valuable artwork by post-conceptual American artist, Wade Guyton (the "Guyton").

2. The Collection purchased a 50% interest in the Guyton in June 2013, and since that time, it never sold, transferred, or otherwise disposed of its ownership interest.

3.      The Collection acquired its ownership interest in the Guyton from Modern Collections, a secondary-market dealership owned by Jay Jopling, the founder of one of the world's leading contemporary art galleries, White Cube.

4.      Unbeknownst to the Collection until recently, Guzzini claims to have purchased the Guyton under a June 28, 2017, agreement with Inigo Philbrick Limited ("IPL"), an entity owned by now-disgraced art dealer, Inigo Philbrick, who previously was associated with White Cube and Modern Collections.

5.      After the Collection learned of Guzzini's claim in or about October 2019, the Collection notified Guzzini of its ownership interest.  At all relevant times, Guzzini led the Collection to believe that it still purported to own, and had physical possession, custody, and control of the Guyton.

6.      Guzzini recently revealed to the Collection and to the Court, however, that its prior representations to the Collection were untrue, and that Guzzini purportedly transferred title to the Guyton on or about November 1, 2019, in an arm's-length transaction to a third party, whose identity it refuses to disclose.

7.      The Collection brings this action to assert conversion claims against Guzzini for interfering with the Collection's ownership interest in that work.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff V&A Collection, LLC is a limited-liability company organized under the laws of New York.

9.      Defendant Guzzini Properties Ltd. is a company registered in the British Virgin Islands, with a principal place of business in London.

10.      Guzzini has consented to this Court's personal jurisdiction.

2

11.     Guzzini filed a related action in this Court on November 1, 2019, seeking to quiet title to a different artwork by Rudolph Stingel (the "Stingel").  *See Guzzini Properties Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019 (the "Related Action").

12.     Guzzini claims that it acquired title to the Guyton, together with the Stingel and a third artwork under the same June 28, 2017, agreement (the "Loan Agreement").

13.     Accordingly, Guzzini has consented to this Court's jurisdiction to adjudicate its rights under the Loan Agreement—the very same contract under which Guzzini claims to have purchased the Guyton artwork at issue in this dispute.

14.     Venue is appropriate in New York County under CPLR § 503 because: (i) Guzzini filed the Related Action here, and therefore it has consented to venue for purposes of adjudicating its rights under the Loan Agreement; and (ii) the Collection's members reside in New York.

## STATEMENT OF FACTS

### The Collection Purchases a 50% Ownership Interest in the Guyton.

15.     In June 2013, the Collection purchased a 50% ownership interest in the Guyton from Modern Collections, which purported to retain the remaining 50% ownership interest.

16.     Modern Collections is a secondary-market dealership owned by Jay Jopling, the founder of one of the world's leading contemporary art galleries, White Cube.

17.     Under the sale with Modern Collections, the Collection agreed to acquire the half-interest in the Guyton and receive an additional $350,000 in cash in exchange for a different work that the Collection had purchased from Modern Collections the prior year.

3

18.     The Collection and Modern Collections agreed that when the Guyton eventually

sold, the Collection would receive $850,000, Modern Collections would receive $700,000, and

they would then split evenly any profit over and above those amounts.

**Philbrick Purports to Transfer an Interest in the Guyton to Guzzini;**
**Guzzini Refuses to Return the Guyton to the Collection Despite its Demands.**

19.     In 2017, without the Collection's knowledge or consent, and without any

compensation to the Collection, Philbrick—on behalf of IPL, another of his entities—purported

to transfer to Guzzini an interest in the Guyton.

20.     Although Guzzini claims to have *purchased* the Guyton from IPL for $6 million,

in reality, as the face of the governing agreement makes clear, Guzzini was *loaning* $6 million to

IPL, and in return IPL purported to pledge the three artworks, including the Guyton and the

Stingel, as collateral.

21.     The "Finance Documents" memorializing this deal reflect that the three works

had a total insured value of $25 million, more than four times the purported $6 million "purchase

price."

22.     And the contract on its fact states that it is a "finance document," a term used in

English law (the governing law of the agreement) to refer to security and loan transactions, not

purchase-and-sale agreements.

23.     Notwithstanding that the deal was in reality a loan, Guzzini at some point began

dealing with the three works, including the Guyton, as if it owned them free and clear.

**Guzzini Claims to Have Transferred the Guyton;**
**Guzzini Concealed this Purported Transfer from the Collection.**

24.     Once the Collection learned of Guzzini's claim to the Guyton in October 2019,

the Collection notified Guzzini.  At all times, Guzzini represented, and led the Collection to

4

believe that it had physical possession, custody and control of the Guyton, and that it purported to remain the owner of the Guyton.

25.     Guzzini recently revealed that its prior representations were false, and it claims to have transferred ownership of the Guyton to a third party on November 1, 2019—the same day that it filed the Related Action seeking to enforce its alleged rights under the Loan Agreement.

26.     The Collection has demanded that Guzzini return the Guyton, but Guzzini has refused to do so.

27.     Guzzini refuses to reveal the identity of the party to whom it allegedly transferred the Guyton, and Guzzini will not disclose the whereabouts of the Guyton.

### FIRST CAUSE OF ACTION
### CONVERSION

28.     The Collection repeats and realleges all the foregoing allegations as if fully set forth herein.

29.      The Collection has a possessory right to and at least a 50% ownership interest in the Guyton.

30.     The Collection's rights in and to the Guyton are superior to any purported rights asserted by Guzzini.

31.     Guzzini recently revealed that it claims to have transferred ownership of the Guyton on November 1, 2019, and that the Guyton is no longer in Guzzini's possession, custody or control.

32.     The Collection has demanded that Guzzini return the Guyton to the Collection. To date, Guzzini has refused to return the Guyton or to recognize the Collection's superior rights in and to the Guyton.

5

33.     Accordingly, Guzzini is liable to the Collection for conversion and is required to pay damages to the Collection.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, V&A Collection, LLC respectfully requests that the Court enter a judgment: (1) requiring Guzzini to pay compensatory damages; and (2) awarding any other and further relief as the Court may deem just and proper.


Dated: February 26, 2020
       New York, New York

                              **GROSSMAN LLP**

                              By: _____
                                  Judd B. Grossman, Esq.
                                  Lindsay E. Hogan, Esq.
                                  Sarah E. Schuster, Esq.
                                  745 Fifth Avenue, 5th Floor
                                  New York, New York 10151
                                  Telephone: (646) 770-7445
                                  Facsimile: (646) 417-7997

                                  *Attorneys for V&A Collection, LLC*

6

## **Verification**

I, Lindsay E. Hogan, Esq., am an attorney admitted to practice law before the Courts of the State of New York, and I am a Partner at Grossman LLP, counsel to Plaintiff V&A Collection, LLC (the "Collection") in this action. I have read the Collection's Complaint dated February 26, 2020, and based on my review of the documents and information in the Collection's possession, I verify that the contents are true and correct to my knowledge, except where alleged on information and belief, and with respect to those allegations, I believe them to be true. I affirm the foregoing statements under penalty of perjury.

Dated: February 26, 2020

By: _____
Lindsay E. Hogan, Esq.

At IAS Part 3 Of The Supreme Court Of The State Of New York Held In And For The County of New York, At 60 Centre Street, New York, New York, On The ___ Day of February 2020.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

V&A Collection, LLC

       *Plaintiff,*

    -against-

Guzzini Properties Ltd.,

       *Defendant.*

---

Index No. 651300/2020

Hon. Joel M. Cohen

Motion Sequence No. 001

---

**[PROPOSED] ORDER TO SHOW CAUSE FOR**
**AN ORDER GRANTING EXPEDITED DISCOVERY**

Upon reading and filing Plaintiff V&A Collection, LLC's (the "Collection") February 28, 2020, Memorandum of Law in Support of its Motion for a Temporary Restraining Order Granting Expedited Discovery; the February 28, 2020, Affirmation of Lindsay E. Hogan, Esq.; and all papers and proceedings in this action,

**IT IS HEREBY ORDERED** that Defendant Guzzini Properties Ltd. ("Guzzini") show cause at IAS Part 3 of this Court, 60 Centre Street, New York, New York on the ___ day of _____ 2020, in Room 222, at _____am/pm, or as soon thereafter as counsel can be heard, why an order should not be made and entered ordering:

    (i)    Expedited discovery from Guzzini, including all documents and communications related to the artwork described in the Verified Complaint (Doc. No. 1) (the "Work"), including without limitation, (1) the past and present location of the

1

Work, (2) the transfer of the Work out of Guzzini's possession and control, and (3) all events or transactions in New York related to the Work; and

(ii)      Any such other and further relief as the Court deems just and proper.

**IT IS FURTHER ORDERED** that pending a hearing on the Collection's Order to Show Cause, Guzzini shall respond to the discovery requests attached as <u>Exhibit 1</u> and <u>Exhibit 2</u> to the February 28, 2020, Affirmation of Lindsay E. Hogan, Esq., by March 2 and March 6, respectively, via electronic mail to counsel for the Collection, Judd B. Grossman, Esq., Grossman LLP at jgrossman@grossmanllp.com;

**IT IS FURTHER ORDERED** that service as follows of a copy of this Order and the papers upon which the same is based by (i) electronic mail upon Counsel for Guzzini, Wendy J. Lindstrom, Esq., MAZZOLA LINDSTROM LLP, 733 Third Avenue, 15th Floor, New York, New York  10017, (646) 216-8300, wendy@mazzolalindstrom.com; and (ii) Federal Express to Guzzini's principal place of business, Guzzini Properties Ltd., 21-24 Milbank Tower, 4th Floor, London SW1P 4QP; on or before _____, 2020, shall be deemed good and sufficient service;

**IT IS FURTHER ORDERED** that Guzzini's papers in response to the Collection's motion, if any, shall be served by filing electronically copies of the same via the Court's Electronic Filing (NYSCEF) system no later than _____, 2020; and

**IT IS FURTHER ORDERED** that the Collection's reply papers in further support of its motion, if any, shall be served by filing electronically copies of the same via the Court's Electronic Filing (NYSCEF) system no later than _____, 2020.

**SO ORDERED**:

Dated: _____, 2020

_____
J.S.C

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

V&A Collection, LLC

              *Plaintiff*,

     -against-

Guzzini Properties Ltd.,

              *Defendant*.

Index No. 651300/2020

Hon. Joel M. Cohen

Motion Sequence No. 001

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY**

**GROSSMAN LLP**

Judd B. Grossman, Esq.
Lindsay E. Hogan, Esq.
Sarah E. Schuster, Esq.
745 Fifth Avenue, 5th Floor
New York, New York  10151
Telephone:  (646) 770-7445
Facsimile:  (646) 417-7997

*Attorneys for V&A Collection, LLC*

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ........................................................................... 1

**FACTUAL AND PROCEDURAL BACKGROUND** ............................................. 2

    **The Collection Purchases a 50% Ownership Interest in the Work.** ........................ 2

    **Philbrick Purports to Transfer an Interest in the Work to Guzzini;**
    **Guzzini Refuses to Return the Work to the Collection Despite its Demands.** ............. 2

    **Guzzini Transfers the Work to a Third Party and Initiates the Related Action.** ....... 3

    **In Guzzini's Related Action, Guzzini Avails Itself of**
    **This Court To Adjudicate the Finance Document,**
    **And Admits It Participates Directly In the New York Art Market.** ........................ 4

**LEGAL ARGUMENT** ....................................................................................... 5

I.    **The Collection Is Entitled to Expedited Discovery**
    **Where Defendant Uniquely Possesses Critical Information.** ................................. 5

II.    **This Court Has Jurisdiction to Grant the Relief Requested**
    **Because Guzzini Has Consented to Personal Jurisdiction in this Court;**
    **Alternatively, Plaintiff Should Be Granted Expedited Jurisdictional Discovery.** ...... 7

III.    **The Collection Is Entitled to Expedited Discovery**
    **Even If Some Information Is Located Outside the United States.** ........................... 11

**CONCLUSION** ................................................................................................ 13

-i-

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Abbacor, Inc. v. Miller*,
   No. 01 CIV. 0803 (JSM), 2001 WL 1006051 (S.D.N.Y. Aug. 31, 2001) .................................7

*Alexander v. Spanierman Gallery, LLC*,
   33 A.D.3d 411, 822 N.Y.S.2d 506 (1st Dep't 2006)....................................................6

*Bel Geddes v. Zeiderman*,
   228 A.D.2d 393, 644 N.Y.S.2d 729 (1st Dep't 1996)...................................................5

*BHOD v. City of New York*,
   22. Misc.3d 1136(A), 2009 WL 692080 (Sup. Ct. Kings Co. March 13, 2009)........................5

*British Int'l Ins. Co. v. Seguros La Republica, S.A.*,
   No. 90CIV.2370(JFK)(FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000) ..............................10

*Exclaim Assocs. Ltd. v. Nygate*,
   10 Misc. 3d 1063(A), 814 N.Y.S.2d 560, 2005 WL 3501559
   (Sup. Ct. N.Y. Co. Sept. 15, 2005)............................................................8, 11

*First Am. Corp. v. Price Waterhouse LLP*,
   988 F. Supp. 353 (S.D.N.Y. 1997) .............................................................11

*Guzzini Props. Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*,
   Index No. 656467/2019 (Sup. Ct. N.Y. Co.) .............................................. *passim*

*Kozar v. Christie's, Inc.*,
   929 N.Y.S.2d 200 (Sup. Ct. Westchester Co. May 18, 2011) .................................6

*Neuralstem, Inc. v. StemCells, Inc.*,
   573 F. Supp. 2d 888 (D. Md. 2008) ........................................................8

*One and J Gallery v. Christie's Inc.*,
   Index No. 650005/2019 (Sup. Ct. N.Y. Co.)................................................5

*Peterson v. Spartan Indus., Inc.*,
   33 N.Y.2d 463, 310 N.E.2d 513 (1974) ...................................................8

*Rational Strategies Fund v. Hill*,
   40 Misc.3d 1214(A), 2013 WL 3779654 (Sup. Ct. N.Y. Co. July 18, 2013) ...................5

*Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*,
   32 A.D.3d 150, 816 N.Y.S.2d 470 (1st Dep't 2006)..........................................11

*Rusakiewicz v. Lowe*,
   556 F.3d 1095 (10th Cir. 2009)............................................................7

ii

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
NYSCEF DOC. NO. Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 15 of 127

INDEX NO. 651300/2020

RECEIVED NYSCEF: 02/28/2020

## TABLE OF AUTHORITIES

*Scarminach v. Goldwell GmbH*,
    140 Misc. 2d 103, 531 N.Y.S.2d 188 (Sup. Ct. Monroe Co. 1988) ..........................................11

*Silver v. Alon Zakaim Fine Art Ltd.*,
    115 N.Y.S.3d 669 (1st Dep't Feb. 11, 2020)....................................................................9

*Solomon R. Guggenheim Found. v. Lubell*,
    77 N.Y.2d 311, 569 N.E.2d 426 (1991) ........................................................................10

*SpaceCo Bus. Sols., Inc. v. Mass Engineered Design, Inc.*,
    942 F. Supp. 2d 1148 (D. Colo. 2013) ...........................................................................7

*Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*,
    5 Misc. 3d 285, 783 N.Y.S.2d 758 (Sup. Ct. N.Y. Co. Aug. 9, 2004) .......................................5

*Universal Inv. Advisory SA v. Bakrie Telecom PTE, Ltd.*,
    154 A.D.3d 171, 62 N.Y.S.3d 1 (1st Dep't 2017) ....................................................................8

**STATUTES**

N.Y. C.P.L.R. § 3211 .......................................................................................................8

iii

## PRELIMINARY STATEMENT

Plaintiff V&A Collection, LLC (the "Collection") is the rightful owner of at least a half-interest in a painting by Wade Guyton, entitled "Flaming U" (the "Work").  Defendant Guzzini Properties Ltd. ("Guzzini") for its part, has asserted—in a related *in rem* proceeding, *Guzzini Properties Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019 (the "Related Action")—that it purchased this Work and two other works from an entity controlled by now-disgraced art dealer Inigo Philbrick, in a single transaction memorialized by a single contract.  Because the Collection at all relevant times has been at least a 50% owner of the Work, and it never transferred, sold, or otherwise disposed of its ownership interest to anyone, the Collection has filed this action to quiet title to the Work and to seek damages for Guzzini's unlawful conversion of the Work.

But the Collection just recently learned that—despite repeated prior representations to the Collection that it still had possession of the Work—Guzzini has apparently transferred control of the Work to an unknown third party.  The Collection therefore now asks this Court to permit limited expedited discovery to enable the Collection to determine the current location and possessor of the Work.  This discovery is both crucial and time-sensitive because without it, the Collection runs the very real risk that its unique Work may disappear into the private art market before the Collection can effectively pursue its rights against Guzzini, its current possessor, and other possible defendants.  And the Collection has no other way to obtain this information.

Separately, Guzzini has announced that it intends to seek to dismiss the Collection's claims regarding the Work on the basis of lack of personal jurisdiction.  There can be no merit to such a position, where Guzzini has already voluntarily invoked the jurisdiction of this Court as plaintiff in the Related Action, which will adjudicate Guzzini's rights under the very same

1

contract that forms the basis of the Collection's claims here. Alternatively, if personal jurisdiction is at issue, the Collection should be permitted to obtain expedited jurisdictional discovery. Narrowly-tailored jurisdictional discovery is appropriate because there is ample indication that facts may exist that would permit the Collection to defeat Guzzini's planned motion to dismiss, but those facts are exclusively within Guzzini's control.

## **FACTUAL AND PROCEDURAL BACKGROUND**

**The Collection Purchases a 50% Ownership Interest in the Work.**

In June 2013, the Collection purchased a 50% ownership interest in the Guyton Work from Modern Collections, an entity controlled by British art dealer Inigo Philbrick. (*See* Hogan Aff. Ex. 4 at ¶¶ 2-5.) The Collection and Modern Collections agreed that when the Work eventually sold, the Collection would receive $850,000, Modern Collections would receive $700,000, and they would then split evenly any profit over and above those amounts. (*See id.* at ¶ 6.) Philbrick, on behalf of Modern Collections, memorialized the terms of this transaction at the time in a June 29, 2013, email from his "moderncollections.net" address:

> So that we have it in writing - we are buying together a large format (90 x 53 in) 2006 Flaming U [the Work].
>
> We are 50/50 owners of the work, but upon sale you will return 850k and I will return 700k, and then we split the profit.
>
> You are trading your Guyton X into the deal - receiving the stake in the U and 350k USD.
>
> Glad to be partners.

(*Id.* at Ex. D.)

**Philbrick Purports to Transfer an Interest in the Work to Guzzini;**
**Guzzini Refuses to Return the Work to the Collection Despite its Demands.**

In 2017, without the Collection's knowledge or consent, and without any compensation to the Collection, Philbrick—ostensibly on behalf of IPL, another of his entities—purported to

2

transfer an interest in the Work to Guzzini. This purported transaction is memorialized in a June 28, 2017, agreement (the "Finance Document"). (*See* Ex. 4.) Although Guzzini claims to have *purchased* the Work from IPL for $6 million under the Finance Document, in reality, as the face of the contract itself makes clear, Guzzini was actually *loaning* $6 million to IPL, and in return IPL purported to pledge the three artworks (the Work and two other artworks) as collateral. The Finance Document memorializing this deal reflects that the three works had a total insured value of $25 million—more than four times the purported $6 million "purchase price." (*See id.* at ¶ 1.) That $6 million figure does not reflect a true "purchase price" for artwork in an arm's length, non-distressed sale (as Guzzini claims this was), but rather is consistent with a typical loan-to-value ratio for art-backed loans. And the contract on its fact states that it is a "finance document," a term used in English law (the governing law of the agreement) (*see* at ¶ 8.7; Hogan Aff. ¶ 9), to refer to security and loan transactions, not purchase-and-sale agreements.

IPL apparently failed to make all outstanding payments to Guzzini under the Finance Document, and thereafter Guzzini began dealing with the three artworks, including the Work, as if it owned them free and clear. (Hogan Aff. ¶ 10.)

**<u>Guzzini Transfers the Work to a Third Party and Initiates the Related Action.</u>**

Upon learning of this turn of events, the Collection promptly demanded that Guzzini return the Work, but Guzzini has refused to do so and has declined to recognize the Collection's ownership interest in the Work. (*See id.* at ¶ 11.) In negotiations prior to this lawsuit, including during an in-person meeting in London earlier this month, Guzzini implied it still had possession of the Work; but the Collection has recently learned that Guzzini now purports to have transferred the Work to an unnamed third party on or about November 1, 2019. (*See* Hogan Aff. Ex. 5 at 5:13-6:21.)

That very same day, Guzzini filed the Related Action in this Court to quiet title to another artwork—a painting by Rudolf Stingel (the "Stingel")—that Guzzini purportedly "purchased" under the same Finance Document at issue here. *See Guzzini Props. Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019 (Sup. Ct. N.Y. Co.), Doc. No. 1.

### In Guzzini's Related Action, Guzzini Avails Itself of This Court To Adjudicate the Finance Document, And Admits It Participates Directly In the New York Art Market.

During a February 19, 2020, hearing in the Related Action, Guzzini expressed its intention to move to dismiss, on the basis of lack of personal jurisdiction, any claims brought by Plaintiff regarding the Work. (*See* Hogan Aff. Ex. 5 at 12:22-14:10; 22:25-23:2.) Guzzini is owned by British nationals, Simon and David Reuben[1]; Guzzini's letterhead also reflects addresses in the British Virgin Islands and Switzerland (*see* Ex. 4 at 1). But Guzzini has already availed itself of this Court's jurisdiction by commencing the Related Action in this Court, asking for relief based on the same Finance Document at issue here. All amounts to be paid to Guzzini under the Finance Document are stated in U.S. dollars. (*See id.* at ¶¶ 1, 5.3 and Schedule 2.) Likewise, for all three works that purportedly transferred to Guzzini via the Finance Document, the Finance Document states their insured values in U.S. dollars. (*See id.* at Schedule 1.)

Moreover, in that Related Action, Guzzini has admitted it participates directly in the New York art market, including with respect to the Stingel that Guzzini purportedly acquired via the very same transaction at issue in this suit. Specifically, Guzzini alleges it entered into a consignment agreement with Christie's on March 25, 2019, "agreeing that the Stingel would be

---

[1] The Reuben brothers were named as "the 60th wealthiest people in the world" in a 2016 *Forbes* magazine list. They "are some of the best-known property tycoons in the world," as lenders to iconic landmarks including New York's Plaza Hotel. *See* https://www.bloomberg.com/news/articles/2019-12-09/billionaire-reuben-brothers-are-swept-up-in-art-scandal (last visited Feb. 27, 2020); https://www.artnews.com/art-collectors/top-200-profiles/lisa-reuben/ (last visited Feb. 27, 2020).

4

auctioned during Christie's New York Post-War and Contemporary Art Evening Sale on May 15, 2019." *See Guzzini Props. Ltd.*, Index No. 656467/2019, Doc. No. 14 at ¶ 9.

## <u>LEGAL ARGUMENT</u>

I.    **The Collection Is Entitled to Expedited Discovery**
      <u>**Where Defendant Uniquely Possesses Critical Information.**</u>

"The decision of whether to grant expedited discovery is within the discretion of this Court." *Rational Strategies Fund v. Hill*, 40 Misc.3d 1214(A), 2013 WL 3779654, at *2 (Sup. Ct. N.Y. Co. July 18, 2013). The Court will grant expedited discovery where a defendant uniquely possesses critical information. *See Bel Geddes v. Zeiderman*, 228 A.D.2d 393, 393, 644 N.Y.S.2d 729 (1st Dep't 1996) (expedited discovery appropriate where details were known only by defendants); *BHOD v. City of New York*, 22. Misc.3d 1136(A), 2009 WL 692080, at *14 (Sup. Ct. Kings Co. March 13, 2009) ("expedited discovery is warranted where there is ample need for it"). Here, expedited discovery is especially appropriate "in light of [Defendant's] unique possession of the information necessary to determine the extent of their unlawful conduct." *Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*, 5 Misc. 3d 285, 302, 783 N.Y.S.2d 758 (Sup. Ct. N.Y. Co. Aug. 9, 2004). Indeed, another Justice of this Court recently granted, under similar circumstances, the same relief that is being sought here, and in doing so specifically recognized the exigencies that exist for a plaintiff who is claiming ownership of a work of art that has been transferred to an undisclosed buyer by the defendant. *See One and J Gallery v. Christie's Inc. et al*., Index No. 650005/2019 (Sup. Ct. N.Y. Co.), Jan. 3, 2019, Order (Doc. No. 19) (requiring disclosure of the identity of an unnamed third-party buyer of the contested artwork).

The Collection is entitled to know where the Work is located and to whom it has been transferred by Guzzini. Since at least October 2019, Guzzini has consistently represented to the

Collection that it was in possession of the Work; indeed, it repeatedly refused to return the Work to the Collection, in the process implying that it was within Guzzini's power to do so. (*See* Hogan Aff. ¶¶ 11-13.) Not until the February 19, 2020, hearing in the Related Action did Guzzini reveal that, as of November 2019, the Work has purportedly been transferred to a third party without the Collection's knowledge or consent. (*See* Hogan Aff. Ex. 5 at 5:13-6:21.) It is not clear whether Guzzini still purports to have any type of interest in the Work, or whether Guzzini still exercises any degree of possession or control over the Work. But this information is critical for the Collection to know, in order to determine the extent of its claims against Guzzini, and to assess its legal options against other possible defendants. *See Alexander v. Spanierman Gallery, LLC*, 33 A.D.3d 411, 412, 822 N.Y.S.2d 506, 507 (1st Dep't 2006) (where petitioner sought discovery in advance of the filing and service of a complaint, "petitioner was properly permitted to obtain disclosure of the identity of the individual or entity that purchased the sculpture allegedly stolen from his home" because that buyer would be a "potential defendant in a prospective action by petitioner to, *inter alia*, replevy the artwork").

This discovery is also needed in order to ensure that the Work does not continue to change hands until it becomes untraceable; the Collection needs to protect its interest in this unique Work before it disappears into the private art market for many years. *See Kozar v. Christie's, Inc.*, 31 Misc. 3d 1228(A), 929 N.Y.S.2d 200 (Sup. Ct. Westchester Co. 2011) (in granting preliminary relief enjoining transfer of artwork, court noted that, because artwork is unique, plaintiffs faced the real risk that, without the requested relief, they "may never locate this painting again"). In short, if Guzzini refuses to reveal to the Work's whereabouts and the identity of the party to whom the Work was purportedly transferred, the Collection risks losing the ability to fully adjudicate and vindicate its ownership rights with respect to the Work. And,

6

just as with the facts that would be relevant to jurisdiction (*see infra*), Guzzini is the only known source of this information.

## II. This Court Has Jurisdiction to Grant the Relief Requested Because Guzzini Has Consented to Personal Jurisdiction in this Court; Alternatively, Plaintiff Should Be Granted Expedited Jurisdictional Discovery.

Despite Guzzini's contention that it is not subject to jurisdiction here (*see* Hogan Aff. Ex. 5 at 12:22-14:10), the Court has the authority to grant the relief requested by the Collection because Guzzini has already consented to jurisdiction in New York by commencing proceedings in this state seeking to adjudicate its rights under the very same contract that will be at issue here. Guzzini chose New York as the forum in which it commenced the Related Action, an *in rem* proceeding, on November 1, 2019, claiming that it purchased the Stingel under the Finance Document—the same contract under which Guzzini also claims to have purchased Plaintiff's Work. With the Related Action, therefore, Guzzini has already consented to and invoked this Court's jurisdiction to adjudicate its personal-property rights under the Finance Document (Hogan Aff. Ex. 4), the very same agreement and transaction that will be at the center of this case. *See Abbacor, Inc. v. Miller*, No. 01 CIV. 0803 (JSM), 2001 WL 1006051, at *3 (S.D.N.Y. Aug. 31, 2001) (defendant initiating prior arbitration proceedings in a jurisdiction to adjudicate rights under the same contract at issue in the lawsuit, along with other facts that would otherwise be insufficient to confer personal jurisdiction, sufficient to confer personal jurisdiction over defendant); *SpaceCo Bus. Sols., Inc. v. Mass Engineered Design, Inc.*, 942 F. Supp. 2d 1148, 1156 (D. Colo. 2013), *aff'd*, 553 F. App'x 1008 (Fed. Cir. 2014) (finding personal jurisdiction "based upon implied consent or waiver" over non-resident defendants who previously filed a claim in the forum state that "involves the same transaction"); *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1101 (10th Cir. 2009) (finding that "the act of filing a lawsuit in a particular state is

7

sufficient to establish jurisdiction over the plaintiff in the courts of that state in a subsequent

action" arising from the same transaction); *Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d

888, 897 (D. Md. 2008) (holding that defendant "consents to jurisdiction through the act of filing

a previous suit where the second suit arises from the 'same transaction' or the 'same nucleus of

operative facts'").

      Alternatively, if this Court concludes that Guzzini has not consented to jurisdiction here

by filing the Related Action, or that the record is not sufficient to resolve the question of whether

personal jurisdiction exists, the Collection seeks expedited jurisdictional discovery in order to

respond to Guzzini's planned motion to dismiss for lack of personal jurisdiction the Collection's

claims regarding the Work.  "CPLR 3211(d) authorizes a court to order discovery upon a

showing that facts favoring jurisdiction 'may exist but then cannot be stated.'" *Exclaim Assocs.*

*Ltd. v. Nygate*, 10 Misc. 3d 1063(A), 814 N.Y.S.2d 560, 2005 WL 3501559 at *4 (Sup. Ct. N.Y.

Co. Sept. 15, 2005).  New York courts recognize that jurisdictional arguments under a long-arm

theory of jurisdiction are "likely to be complex," and therefore jurisdictional discovery can be

"desirable, indeed may be essential, and should quite probably lead to a more accurate judgment

than one made solely on the basis of inconclusive preliminary affidavits."  *Peterson v. Spartan*

*Indus., Inc.*, 33 N.Y.2d 463, 467, 310 N.E.2d 513 (1974).

      The Court of Appeals has held that New York law "protects the party to whom essential

jurisdictional facts are not presently known, especially where those facts are within the exclusive

control of the moving party," and that a party opposing a motion to dismiss on jurisdictional

grounds "need only demonstrate that facts 'may exist'" that can defeat the motion.  *See Peterson*,

33 N.Y.2d at 466–67; *see also Universal Inv. Advisory SA v. Bakrie Telecom PTE, Ltd.*, 154

A.D.3d 171, 178, 62 N.Y.S.3d 1, 7 (1st Dep't 2017) (reversing trial court and concluding that

8

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
NYSCEF DOC. NO.  Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 24 of 127

INDEX NO. 651300/2020
RECEIVED NYSCEF: 02/28/2020

plaintiff should have been permitted to conduct jurisdictional discovery where it had "demonstrated that facts 'may exist' in opposition to the motion to dismiss" and such facts were "within the exclusive control of defendants"). "To qualify for additional discovery to support its jurisdictional position, plaintiffs need only make a 'sufficient start' and demonstrate that facts 'may exist' to exercise personal jurisdiction" over a defendant. *Exclaim Assocs. Ltd.*, 2005 WL 3501559 at *4.

Here, Plaintiff has demonstrated that facts supportive of personal jurisdiction "may exist," and that Guzzini is the sole proprietor of that information. Guzzini is owned by two of the world's foremost property tycoons, who invest in real property all over the world, including in New York. But Guzzini's New York ties include facts that are related to the very contract at issue in this case; specifically, in the Related Action, Guzzini purports to have entered into a consignment agreement with Christie's on March 25, 2019, "agreeing that the Stingel would be auctioned during Christie's New York Post-War and Contemporary Art Evening Sale on May 15, 2019." *Guzzini Props. Ltd.*, Index No. 656467/2019, Doc. No. 14 at ¶ 9. That is, Guzzini has admitted that it planned to avail itself of the New York art market in dealing with at least one of the works it purportedly acquired through the Finance Document—the same transaction through which it claims ownership of the Collection's Work. As this Court recently held, and the First Department affirmed unanimously just weeks ago, a consignment of a contested artwork in New York is sufficient to show a party transacted business in New York for jurisdictional purposes. *See Silver v. Alon Zakaim Fine Art Ltd.*, 115 N.Y.S.3d 669, 669 (1st Dep't Feb. 11, 2020) (party transacted business in New York by, among other things, marketing the painting at issue for sale in New York under a consignment agreement with Christie's New York).

9

Moreover, in the Finance Document under which Guzzini purports to have acquired the Work (along with the Stingel and a third artwork), all of the amounts to be paid between Guzzini and IPL are stated in U.S. dollars.  (*See* Hogan Aff. Ex. 4 at ¶ 5.3 and Schedule 2.)  The fact that Guzzini and IPL, neither of which is apparently based in the U.S. (*see id.* at 1), were transacting this deal in U.S. dollars suggests that the parties understood that the entire art-backed loan transaction was in some important respect related to activities or contemplated activities in the United States art market.  Likewise, for all three works collateralized by the loan, the Finance Document states their "insured values" in U.S. dollars.  (*See id.* at Schedule 1.)  This is another strong indication of a tie to the American art market, as it suggests that the works may have been insured via U.S.-based appraisals and/or U.S.-based insurance policies.  Indeed, because IPL remained responsible for insuring all three collateralized artworks while the loan was outstanding (*see id.* at ¶ 3.7), it seems likely that the same insurance policies remained in place for the duration of the Finance Document.  And given New York's central role in the American (not to mention the global) art market, *see Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317, 569 N.E.2d 426, 431 (1991) (noting New York's "worldwide reputation as a preeminent cultural center" and its interest in discouraging "illicit trafficking in stolen art"), it is likely that jurisdictional discovery will uncover additional clear links between the Finance Document and New York, including facts directly relevant to the Collection's Work.

In sum, by Guzzini's own admission, Guzzini transacts business in New York—including business directly related to the art-backed loan transaction that is at the heart of this lawsuit.  And other aspects of that transaction corroborate the inference that the deal was connected to the American art market, which is centered in New York.  On these facts, expedited jurisdictional discovery is warranted to permit the Collection to oppose Guzzini's impending motion.

10

III.    **The Collection Is Entitled to This Expedited Discovery**
        **Even If Some Information Is Located Outside the United States.**

At a recent hearing, Guzzini signaled that it may object to discovery requests from the Collection because they will involve cross-border discovery.  (*See* Hogan Aff. Ex. 5 at 18:22-19:9.)  As an initial matter, the burden will be squarely upon Guzzini to explain why discovery should not proceed under New York's usual procedural mechanisms.  *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, No. 90CIV.2370(JFK)(FM), 2000 WL 713057, at *8 (S.D.N.Y. June 2, 2000) (the "party relying on foreign law has the burden of showing that such law actually bars [the] production" or testimony at issue, and must "provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law"; conclusory assertions do not suffice); *Scarminach v. Goldwell GmbH*, 140 Misc. 2d 103, 106–07, 531 N.Y.S.2d 188, 190–91 (Sup. Ct. Monroe Co. 1988) (in case involving discovery from a German entity, the burden was on the objecting party to show that resort to the Hague Convention procedures for discovery, instead of the procedures under the New York CPLR, was required, "given the particular facts of this case, the sovereign interests involved, and the effectiveness of such procedures").  Thus, at this early phase of these proceedings, the Collection is not required to anticipate the arguments that Guzzini may raise in objecting to this discovery on the basis of one or more foreign laws.  At this juncture, the Collection simply notes that New York courts have ordered discovery, including jurisdictional discovery, from United Kingdom-based entities on many occasions.  *See*, *e.g.*, *First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 356 (S.D.N.Y. 1997), *modified on other grounds on reconsideration*, No. M8-85 (RWS), 1998 WL 148421 (S.D.N.Y. Mar. 27, 1998), *and aff'd*, 154 F.3d 16 (2d Cir. 1998) (ordering discovery from an English partnership entity, notwithstanding its invocation of English banker-customer confidentiality obligations under English law);

11

*Exclaim Assocs. Ltd.*, 814 N.Y.S.2d at \*8 (granting leave to conduct jurisdictional discovery with respect to U.K.-based entities).

Even if Guzzini can show that some foreign law poses an impediment to the Collection's requested discovery, the First Department has articulated multiple factors that should be considered when a court is contemplating enforcing discovery seeking information located abroad:  (1) "the importance to the . . . litigation of the . . . information requested"; (2) "the degree of specificity of the request"; (3) "whether the information originated in the United States"; (4) "the availability of alternative means of securing the information"; and (5) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*, 32 A.D.3d 150, 155, 816 N.Y.S.2d 470, 475 (1st Dep't 2006).  And where a conflicting foreign statute exists that limits the disclosure of information to the United States, the Court should also consider (1) "the good faith of the party resisting discovery"; (2) "the hardship of compliance on the party from whom discovery is sought"; (3) "the nationality of the person who must provide the information"; (4) "whether the party resisting discovery is the plaintiff"; and (5) "the amount of discovery already provided." *Id.*

Here, to the extent any of the discovery the Collection seeks conflicts with a foreign legal regime, these factors overwhelmingly weigh in the Collection's favor.  The Collection is seeking information that goes to the heart of its claims in this action.  It seeks information related to this Court's ability to exercise personal jurisdiction over the Defendant and information relating to the whereabouts of the Work, directly informing its cause of action for conversion against Defendant.  The requests are limited and narrow.  (*See* Hogan Aff. Exs. 1-2.)  The information

12

being sought is available solely from Guzzini, and given the limited nature of the requests, will not create undue hardship on Guzzini.

And the Collection's discovery requests are particularly appropriate because much of the same information will be relevant and discoverable in the Related Action. Where Guzzini, as the plaintiff in that Related Action, will be subject to discovery with respect to the very same transaction that is at issue here, Guzzini's resistance to producing that same information in this related dispute rings hollow. On the facts presented here, the mere fact that this case implicates cross-border discovery does not preclude this Court from requiring Guzzini to comply with the discovery requested in this motion.

## **CONCLUSION**

Guzzini has transferred the Collection's property without the Collection's knowledge or consent, and the Collection is entitled to discover where and to whom the property has been transferred so that the Collection may adequately protect its ownership interest in the Work. And to the extent that Guzzini intends to move to dismiss the Collection's claims here for lack of personal jurisdiction, that impending motion is meritless where Guzzini has already enlisted this Court to adjudicate the very contract at issue here; alternatively, the Collection is entitled to discovery concerning jurisdictional facts, to allow the Collection to adequately oppose Defendant's motion. Accordingly, the Collection respectfully requests that the Court grant its order to show cause for expedited discovery against Guzzini.

13

Dated: February 28, 2020
      New York, New York

Respectfully Submitted,

**GROSSMAN LLP**

By: _____
    Judd B. Grossman, Esq.
    Lindsay E. Hogan, Esq.
    Sarah E. Schuster, Esq.
    745 Fifth Avenue, 5th Floor
    New York, New York 10151
    (646) 770-7445

    *Attorneys for V&A Collection, LLC*

14

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| V&A Collection, LLC | Index No. 651300/2020 |
| *Plaintiff,* | Hon. Joel M. Cohen |
| -against- | Motion Sequence No. 001 |
| Guzzini Properties Ltd., | |
| *Defendant.* | |

### AFFIRMATION OF LINDSAY E. HOGAN, ESQ. IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE SEEKING EXPEDITED DISCOVERY

I, Lindsay E. Hogan, Esq., an attorney admitted to practice law before the Courts of the State of New York, hereby declare under penalty of perjury as follows:

1.     I am counsel to Plaintiff V&A Collection, LLC (the "Collection") in this action and as such I am fully familiar with the facts alleged herein.  I submit this Affirmation in support of the Collection's Order to Show Cause seeking Expedited Discovery.

2.     A true and correct copy of Plaintiff's First Set of Requests for Production of Documents to Defendant Related to the Location of the Work is attached as <u>Exhibit 1</u>.

3.     A true and correct copy of Plaintiff's First Set of Requests for Production of Documents to Defendant Related to Jurisdictional Discovery is attached as <u>Exhibit 2</u>.

**<u>The Collection Purchases a 50% Ownership Interest in the Guyton.</u>**

4.     In June 2013, the Collection purchased a 50% ownership interest in the Guyton from Modern Collections, which purported to retain the remaining 50% ownership interest.

5.     A true and correct copy of the February 11, 2020, Affidavit of Andre Sakhai, a Member of the Collection, is attached as <u>Exhibit 3</u>.

**Philbrick Purports to Transfer an Interest in the Guyton to Guzzini;**
**Guzzini Refuses to Return the Guyton to the Collection Despite its Demands.**

6.      In 2017, without the Collection's knowledge or consent, and without any compensation to the Collection, Philbrick—on behalf of IPL, another of his entities—purported to transfer to Guzzini an interest in the Guyton.

7.      Although Guzzini claims to have *purchased* the Guyton from IPL for $6 million, in reality, as the face of the governing agreement makes clear, Guzzini was *loaning* $6 million to IPL, and in return IPL purported to pledge the three artworks, including the Guyton and the Stingel, as collateral.  A true and correct copy of the June 28, 2017, agreement between Guzzini Properties Ltd. and Inigo Philbrick Ltd. is attached as Exhibit 4.

8.      The "Finance Documents" memorializing this deal reflect that the three works had a total insured value of $25 million, more than four times the purported $6 million "purchase price."  (Ex. 4 at ¶ 1.)

9.      And the contract on its fact states that it is a "finance document," a term used in English law (the governing law of the agreement) to refer to security and loan transactions, not purchase-and-sale agreements.

10.     IPL apparently failed to make all outstanding payments to Guzzini under the Finance Document, and thereafter Guzzini began dealing with the three artworks, including the Work, as if it owned them free and clear.

**Guzzini Claims to Have Transferred the Guyton;**
**Guzzini Concealed this Purported Transfer from the Collection.**

11.     Once the Collection learned of Guzzini's claim to the Guyton in October 2019, the Collection notified Guzzini.  At all times, Guzzini represented, and led the Collection to

2

believe that it had physical possession, custody and control of the Guyton, and that it purported to remain the owner of the Guyton.

12.     Guzzini recently revealed that its prior representations were false, and it claims to have transferred ownership of the Guyton to a third party on November 1, 2019—the same day that it filed the Related Action seeking to enforce its alleged rights under the Loan Agreement.

13.     The Collection has demanded that Guzzini return the Guyton, but Guzzini has refused to do so.

14.     Guzzini refuses to reveal the identity of the party to whom it allegedly transferred the Guyton, and Guzzini will not disclose the whereabouts of the Guyton. A true and correct highlighted copy of the transcript of the February 19, 2020, hearing in *Guzzini Properties Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019 is attached as Exhibit 5.

15.     On February 26, 2020, I informed Wendy Lindstrom, Esq., counsel for Guzzini Properties Ltd. that the Collection, LLC would move by Order to Show Cause this week for an Order Granting Expedited Discovery. A true and correct copy of the February 26-27, 2020, email chain to Wendy J. Lindstrom, Esq. is attached as Exhibit 6.

16.     No prior application has been made for the relief requested herein.

Dated: February 28, 2020
New York, New York

Lindsay E. Hogan

3

# EXHIBIT 1

Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 34 of 127

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| V&A Collection, LLC, | Index No. 651300/2020 |
| *Plaintiff,* | Hon. Joel M. Cohen |
| -against- |  |
| Guzzini Properties Ltd., |  |
| *Defendant.* |  |

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS RELATING TO LOCATION OF ARTWORK

PLEASE TAKE NOTICE that, under Article 31 of the New York Civil Practice Law and Rules, Plaintiff V&A Collection, LLC, by and through its undersigned counsel, hereby requests that Defendant Guzzini Properties Ltd. produce for copying and inspection, no later than two (2) days after service, at the offices of Grossman LLP, 745 Fifth Avenue, 5th Floor, New York, New York 10151, copies of the documents and materials described herein, as well as written responses and objections, if any, to these requests (the "Requests").

## INSTRUCTIONS

1. These Requests are continuing in nature, and you must promptly supplement your production if and when you obtain or discover additional responsive documents prior to trial.

2. You must produce documents as kept in the ordinary course of business. Documents attached to each other should not be separated. If any portion of any document is responsive to any Request, then the entire document must be produced.

3. The singular and plural forms of words are used interchangeably, as are the masculine and feminine forms and the present and past tense of verbs.

4.      Your response to these Requests shall include all the documents and information in your possession, custody or control, or which are otherwise available to you, regardless of whether such documents are possessed by you or your employees, agents, parent companies, subsidiaries, affiliates, investigators, predecessors, successors, or representatives, or by your attorneys or their employees or investigators.

5.      If you cannot comply in full with any of the Requests or with any of these instructions after due diligence is exercised to secure the necessary information, comply to the extent possible, including by providing a detailed explanation as to why full compliance is not possible, and state whatever information, knowledge or belief you have concerning the unanswered portion.

6.      If any document responsive to any request is withheld on the ground of the attorney-client privilege or any other applicable privilege or protection, provide a list of each withheld document, along with information sufficient to identify the nature of the document and to support the grounds upon which it is withheld, including but not limited to the persons who created, received, and/or reviewed the document, the date of its creation, the document's subject, and the nature of the privilege or other protection on the basis of which the document is withheld.

7.      If you object to production on any basis other than privilege, then state your objection(s) and indicate whether you are complying with the Request in whole or in part.

8.      If you object to any document on the grounds of over-breadth, specifically state the manner in which it is overly broad and respond to the request as narrowed to conform to such objection.  If you cannot respond fully, or you object in part, to any of these Requests, you are nevertheless required to respond to the remaining portion.

9.      All production of documents maintained in electronic form shall be produced either pursuant to stipulation and/or order regarding electronic discovery or, if no such order or agreement of the parties is entered or in place as of the date on which your responses to the Requests are due, then as searchable PDFs or searchable TIFFs with a load file and extracted metadata.  Production of responsive documents is required regardless of whether the custodian purported to "delete" such documents, if such documents are capable of being retrieved or restored.

10.      The relevant time period (the "Relevant Period") covered by the Requests is from June 1, 2017, to the present unless otherwise stated.

## DEFINITIONS

A.      "And" and "Or" have both conjunctive and disjunctive meanings.

B.      "Any" and "All" include each and every.  Any term, whether singular or plural, has both singular and plural meaning.

C.      "Communication" means and includes the conveyance to or exchange of information of any kind or messages with any person for any purpose by any written, verbal, electronic or other means or method, including without limitation, any document that abstracts, digests, references, transcribes, memorializes or records any such communication.

D.      "Concerning" shall be interpreted broadly and shall mean concerning, mentioning, constituting, relating to, touching upon, or reflecting.

E.      "You," "Your," and "Guzzini" means defendant Guzzini Properties Ltd., its predecessors and successors in interest, subsidiaries, affiliates, officers, owners, agents, servants, employees, independent contractors, representatives, consultants, entities or anyone else purporting to act, directly or indirectly, on its behalf or under its control or its direction.

F.      "Document(s)" shall be construed in its broadest sense to include without limitation all writings and drawings of any kind whatsoever, including without limitation, all sketches, illustrative materials, correspondence, lists, notes, reports, brochures, presentations, notations, memoranda, reports, summaries, diaries, calendars, planners, diaries, transcripts or charts, meeting minutes, corporate resolutions, telephone logs, text messages, together with every tangible thing produced by handwriting, typewriting, printing, photocopying, photo offsetting, photography, microfilming, or by any tape, cassette, film, videotape, or disc recording, and all data or information stored on computer-readable media, such as electromagnetic or other disks, diskettes, hard disk drives, tapes, cartridges, and CD-ROM, including, but not limited to, software, filmware, source code, electronic mail, web-site postings, and word processing documents. Each draft, annotated version, or otherwise non-identical copy of a document shall be deemed to include a request for any of all transmittal sheets, cover letters, exhibits, enclosures or attachments to such document, in addition to the document in its full and un expurgated form.

G.      "Including" shall mean "including, without limitation."

H.      The "Work" means and refers to the valuable artwork by post-conceptual American artist, Wade Guyton, as described in the Complaint in the above-captioned action.

I.      "Complaint" means and refers to the Verified Complaint filed by Plaintiff on February 26, 2020, in the above-captioned action.

J.      References to any individual or entity shall be interpreted to refer to that individual or entity and any other individual or entity acting on such individual or entity's behalf, including agents, attorneys, representatives, employees, partners, members, officers or contractors.

Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 38 of 127

## DOCUMENT REQUESTS

1.     Documents sufficient to show the physical location of the Work at all times during the Relevant Period, including its current location.

2.     Documents sufficient to identify all persons and entities having physical possession, custody, or control of the Work at all times during the Relevant Period.

3.     Documents reflecting the purported transfer of the Work from Guzzini, including without limitation any invoice, bill of sale, or purchase-and-sale agreement.  (*See* February 19, 2020, Hearing Transcript in *Guzzini Properties Ltd. v. "Untitled by Rudolf Stingel, 2012," in Rem*, Index No. 656467/2019 (Sup. Ct. N.Y. Co.) at 5:13-18; 16:6-14.)

Dated: February 28, 2020
New York, New York

**GROSSMAN LLP**

By: _____

Judd B. Grossman, Esq.
jgrossman@grossmanllp.com
Lindsay E. Hogan, Esq.
lhogan@grossmanllp.com
Sarah E. Schuster, Esq.
sschuster@grossmanllp.com
745 Fifth Avenue, 5th Floor
New York, New York  10151
Telephone:  (646) 770-7445
Facsimile:  (646) 417-7997

*Attorneys for Plaintiff V&A Collection, LLC*

To:      Wendy J. Lindstrom, Esq.
MAZZOLA LINDSTROM LLP
733 Third Avenue, 15th Floor
New York, New York  10017
(t): (646) 216-8300
wendy@mazzolalindstrom.com

*Attorneys for Guzzini Properties Ltd.*

# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

V&A Collection, LLC,

                            *Plaintiff,*

        -against-

Guzzini Properties Ltd.,

                            *Defendant.*

Index No. 651300/2020

Hon. Joel M. Cohen

---

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS RELATING TO JURISDICTION

PLEASE TAKE NOTICE that, under Article 31 of the New York Civil Practice Law and Rules, Plaintiff V&A Collection, LLC, by and through its undersigned counsel, hereby requests that Defendant Guzzini Properties Ltd. produce for copying and inspection, no later than seven (7) days after service, at the offices of Grossman LLP, 745 Fifth Avenue, 5th Floor, New York, New York 10151, copies of the documents and materials described herein, as well as written responses and objections, if any, to these requests (the "Requests").

### INSTRUCTIONS

1.      These Requests are continuing in nature, and you must promptly supplement your production if and when you obtain or discover additional responsive documents prior to trial.

2.      You must produce documents as kept in the ordinary course of business. Documents attached to each other should not be separated. If any portion of any document is responsive to any Request, then the entire document must be produced.

3.      The singular and plural forms of words are used interchangeably, as are the masculine and feminine forms and the present and past tense of verbs.

4.      Your response to these Requests shall include all the documents and information in your possession, custody or control, or which are otherwise available to you, regardless of whether such documents are possessed by you or your employees, agents, parent companies, subsidiaries, affiliates, investigators, predecessors, successors, or representatives, or by your attorneys or their employees or investigators.

5.      If you cannot comply in full with any of the Requests or with any of these instructions after due diligence is exercised to secure the necessary information, comply to the extent possible, including by providing a detailed explanation as to why full compliance is not possible, and state whatever information, knowledge or belief you have concerning the unanswered portion.

6.      If any document responsive to any request is withheld on the ground of the attorney-client privilege or any other applicable privilege or protection, provide a list of each withheld document, along with information sufficient to identify the nature of the document and to support the grounds upon which it is withheld, including but not limited to the persons who created, received, and/or reviewed the document, the date of its creation, the document's subject, and the nature of the privilege or other protection on the basis of which the document is withheld.

7.      If you object to production on any basis other than privilege, then state your objection(s) and indicate whether you are complying with the Request in whole or in part.

8.      If you object to any document on the grounds of over-breadth, specifically state the manner in which it is overly broad and respond to the request as narrowed to conform to such objection.  If you cannot respond fully, or you object in part, to any of these Requests, you are nevertheless required to respond to the remaining portion.

9.      All production of documents maintained in electronic form shall be produced either pursuant to stipulation and/or order regarding electronic discovery or, if no such order or agreement of the parties is entered or in place as of the date on which your responses to the Requests are due, then as searchable PDFs or searchable TIFFs with a load file and extracted metadata.  Production of responsive documents is required regardless of whether the custodian purported to "delete" such documents, if such documents are capable of being retrieved or restored.

10.      The relevant time period (the "Relevant Period") covered by the Requests is from June 1, 2017, to the present unless otherwise stated.

## DEFINITIONS

A.      "And" and "Or" have both conjunctive and disjunctive meanings.

B.      "Any" and "All" include each and every.  Any term, whether singular or plural, has both singular and plural meaning.

C.      "Communication" means and includes the conveyance to or exchange of information of any kind or messages with any person for any purpose by any written, verbal, electronic or other means or method, including without limitation, any document that abstracts, digests, references, transcribes, memorializes or records any such communication.

D.      "Concerning" shall be interpreted broadly and shall mean concerning, mentioning, constituting, relating to, touching upon, or reflecting.

E.      "You," "Your," and "Guzzini" means defendant Guzzini Properties Ltd., its predecessors and successors in interest, subsidiaries, affiliates, officers, owners, agents, servants, employees, independent contractors, representatives, consultants, entities or anyone else purporting to act, directly or indirectly, on its behalf or under its control or its direction.

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
NYSCEF DOC. NO.

INDEX NO. 651300/2020

RECEIVED NYSCEF: 02/28/2020

Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 44 of 127

F.      "Document(s)" shall be construed in its broadest sense to include without limitation all writings and drawings of any kind whatsoever, including without limitation, all sketches, illustrative materials, correspondence, lists, notes, reports, brochures, presentations, notations, memoranda, reports, summaries, diaries, calendars, planners, diaries, transcripts or charts, meeting minutes, corporate resolutions, telephone logs, text messages, together with every tangible thing produced by handwriting, typewriting, printing, photocopying, photo offsetting, photography, microfilming, or by any tape, cassette, film, videotape, or disc recording, and all data or information stored on computer-readable media, such as electromagnetic or other disks, diskettes, hard disk drives, tapes, cartridges, and CD-ROM, including, but not limited to, software, filmware, source code, electronic mail, web-site postings, and word processing documents.  Each draft, annotated version, or otherwise non-identical copy of a document shall be deemed to include a request for any of all transmittal sheets, cover letters, exhibits, enclosures or attachments to such document, in addition to the document in its full and un expurgated form.

G.      "Including" shall mean "including, without limitation."

H.      The "Work" means and refers to the valuable artwork by post-conceptual American artist, Wade Guyton, as described in the Complaint in the above-captioned action.

I.      The "Agreement" means and refers to the June 28, 2017, agreement between Guzzini and Inigo Philbrick Ltd.

J.      "Complaint" means and refers to the Verified Complaint filed by Plaintiff on February 26, 2020, in the above-captioned action.

K.      References to any individual or entity shall be interpreted to refer to that individual or entity and any other individual or entity acting on such individual or entity's behalf,

including agents, attorneys, representatives, employees, partners, members, officers or contractors.

## DOCUMENT REQUESTS

1.      Documents sufficient to show the physical location of the Work at all times during the Relevant Period, including its current location.

2.      Documents sufficient to identify all persons and entities having physical possession, custody, or control of the Work at all times during the Relevant Period.

3.      All Documents and Communications concerning any efforts by Guzzini to market, consign, exhibit, loan and sell the Work during the Relevant Period.

4.      All Documents and Communications concerning any appraisals, valuations and estimates of the Work conducted, or prepared by a person or entity in New York during the Relevant Period.

5.      All Documents and Communications concerning events or transactions in New York relating to the Agreement, including without limitation, any auction consignments.

6.      All Documents and Communications concerning any money or consideration given or received by Guzzini in connection with the Work.

Dated: February 28, 2020
New York, New York

GROSSMAN LLP

By: _____

Judd B. Grossman, Esq.
jgrossman@grossmanllp.com
Lindsay E. Hogan, Esq.
lhogan@grossmanllp.com
Sarah E. Schuster, Esq.
sschuster@grossmanllp.com
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997

*Attorneys for Plaintiff V&A Collection, LLC*

To: Wendy J. Lindstrom, Esq.
MAZZOLA LINDSTROM LLP
733 Third Avenue, 15th Floor
New York, New York 10017
(t): (646) 216-8300
wendy@mazzolalindstrom.com

*Attorneys for Guzzini Properties Ltd.*

7

# EXHIBIT 3

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

Guzzini Properties Ltd.,

                              *Plaintiff,*

          -against-

"Untitled by Rudolf Stingel, 2012," in Rem,

                              *Defendant.*

---

Index No.  656467/2019

Honorable Joel M. Cohen

Motion Sequence No. 002

---

## <u>AFFIDAVIT OF ANDRE SAKHAI</u>

STATE OF CALIFORNIA          )
                             ) ss.:
COUNTY OF LOS ANGELES        )

I, ANDRE SAKHAI, being duly sworn, depose and state as follows under penalty of perjury:

1.      I am a member of V&A Collection, LLC (the "Collection"), proposed Intervenor-Plaintiff in the above-referenced action and I submit this Affidavit in support of the Collection's Motion to Intervene and for a Temporary Restraining Order.

2.      In June 2013, the Collection purchased a 50% ownership interest in an artwork, Wade Guyton, *Untitled* ("Flaming U"), 2006, Epson UltraChrome inkjet on linen, 90 in. x 53 in. (the "Work"), from Modern Collections.[1]

3.      Modern Collections at the time was a secondary-market art dealership co-owned by Jay Jopling, the founder of one of the world's leading contemporary art galleries, White Cube, and now-disgraced art dealer, Inigo Philbrick (a former White Cube employee).  A true and

---

[1] The Collection previously was registered as V&A Gallery, LLC.  On December 16, 2019, the Collection filed a Certificate of Amendment of Articles of Organization changing the entity name under Section 211 of the Limited Liability Company Law.

1

Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 50 of 137

correct copy of *Who Is Inigo Philbrick? Meet the Man Behind One of the Biggest Potential Modern Art Scandals*, ARTnews, December 3, 2019, https://www.artnews.com/art-news/news/inigo-philbrick-dealer-lawsuits-explained-1202670107/, is attached as <u>Exhibit A</u>.

4.      Under the sale with Modern Collections, the Collection agreed to acquire the half-interest in the Work and receive an additional $350,000 in cash in exchange for a different work that it owned by the same artist, entitled "X" (the "Guyton X").

5.      The Guyton X had been purchased from Modern Collections under a July 25, 2012, invoice.  A true and correct copy of the July 25, 2012, invoice is attached as <u>Exhibit B</u>. And the Collection transferred the Guyton X to Modern Collections under a July 1, 2013, invoice.  A true and correct copy of the July 1, 2013, invoice is attached as <u>Exhibit C</u>.

6.      The Collection and Modern Collections agreed that when the Work eventually sold, the Collection would receive $850,000, Modern Collections would receive $700,000, and they would then split evenly any profit over and above those amounts.

7.      Philbrick, on behalf of Modern Collections, memorialized the terms of this transaction at the time in a June 29, 2013, email from his "modercollections.com" address.  A true and correct copy of the June 29, 2013, email correspondence is attached as <u>Exhibit D</u>.

8.      In 2017, without the Collection's knowledge or consent, and without any compensation to the Collection, Philbrick, on behalf of Inigo Philbrick Limited, purported to transfer an interest in the Work to Guzzini.  A true and correct copy of an August 28, 2018, letter and the June 27, 2017, agreement between Guzzini and Inigo Philbrick Limited is attached as <u>Exhibit E</u>.

9.      The Collection has demanded that Guzzini return the Work, but Guzzini has refused to do so and has declined to recognize the Collection's ownership interest in the Work.

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and to the best of my knowledge.

Dated: February 11, 2020

By: _____

Andre Sakhai

Sworn to before me on this
11th day of February 2020

_____ , notary public
Notary Public

3

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of _Los Angeles_ )

On _2/11/2020_ before me, _Dauve Turner, notary public_
 Date                            Here Insert Name and Title of the Officer

personally appeared _Andre Sakhey_
                                    Name(s) of Signer(s)

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                     Signature of Notary Public

**DAUVE A. TURNER**
Notary Public - California
Los Angeles County
Commission # 2288678
My Comm. Expires May 16, 2023

_Place Notary Seal Above_

───────────────── **OPTIONAL** ─────────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer — Title(s): _____          ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General                    ☐ Partner — ☐ Limited ☐ General
☐ Individual          ☐ Attorney in Fact            ☐ Individual          ☐ Attorney in Fact
☐ Trustee             ☐ Guardian or Conservator     ☐ Trustee             ☐ Guardian or Conservator
☐ Other: _____                    ☐ Other: _____
Signer Is Representing: _____             Signer Is Representing: _____

©2015 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #5907

4

# EXHIBIT A

**ARTnews**      ☰ Menu      **READ NEXT**  Sotheby's Has Hockney's $39.2 M. 'Splash' for London ...

home      artnews      news

# Who Is Inigo Philbrick? Meet the Man Behind One of the Biggest Potential Modern Art Scandals

December 3, 2019 3:40pm

**A** **young man with a reddish beard** and tailored jacket sat on the aisle at Christie's New York November 2011 evening sale and calmly underbid four works from the single-owner sale of software mogul Peter Norton's holdings— two David Hammonses, a Barbara Kruger called *Untitled (When I hear the word culture I take out my checkbook)*, and then a Mona Hatoum that sold for a record $470,500. Later in the evening, the young man finally outgunned his older rivals to take down Andreas Gursky's *Rhein II* from 1999; he paid a record price for a Gursky at $4.33 million, which was also the highest price for any photograph at auction.

ADVERTISEMENT



THE ESSENTIAL NEW YORK ART FAIR
PIERS 90 AND 94 2020
THE ARMORY SHOW
MARCH 5–8 NEW YORK
ATHENA ART FINANCE

The sale marked then 24-year-old-art-school-graduate-turned-White-Cube-gallery-private-dealer **Inigo Philbrick**'s debut among the select group of international art dealers who can be seen publicly bidding for and buying works in global evening sales. Although not able to play in the thin air above $10 million, it was unusual and attention-getting that such a young player would emerge in the marketplace. In five years' time, Philbrick would report to the U.K.'s Companies House database an operating turnover of £50.6 million and a net profit of £1.61 million for 2016. The next year his reported turnover almost doubled to £96.4 million and a net operating loss of £935,117, but that, a footnote explained, was attributable to Brexit-hobbled British Pound Sterling which caused a currency loss of £3.3 million.

### Related Articles



Even before Philbrick was able to post such big numbers, he had no trouble regularly getting a table at the A-list-celebrity-favored C London restaurant or holding court while ordering outrageously expensive bottles of Bordeaux, within shouting distance from the Nahmads and Mugrabis, on the terrace of the Three Kings hotel in Basel during that city's exclusive summer fair.

6

Summer fair.

**Dealer Inigo Philbrick, Subject of Several Pending Lawsuits, May Own $70 M. in Assets**

**In Lawsuit Over Kusama 'Infinity Mirror Room', German Firm Alleges Dealer Inigo Philbrick Won't Return $14 M. in Art**

By May 2015 he had become a familiar figure on that blue-chip circuit, snapping up, at Phillips New York, Rudolf Stingel's third-party-guaranteed *Untitled* (1996), a large abstraction, for $1.7 million. Back in London's Mayfair neighborhood, Philbrick now had his own eponymous gallery where he had been staging cutting-edge exhibitions, such as "Abstraction/Figuration," which featured works by Joe Bradley and Sterling Ruby, and a two-person Tauba Auerbach and R. H. Quaytman show, both of which opened in 2013. A show of Stingel's "Instruction" paintings later opened in June 2016.

Not yet 30 years old and without the help of an art-dealing family or a fortune from other endeavors, Philbrick, outfitted in Zegna suits he bought in Italy, was by all outward appearances a tremendous success. In December 2018 Philbrick opened a satellite space in Miami's Design District, a stone's throw from the de la Cruz Collection. At the start of 2019, Philbrick was poised to become a major figure in the global art market. But allegations made in recent court cases suggest that beneath what seemed to be success, Philbrick may have been furiously kiting transactions to maintain the impression that he was solvent. He has been accused of having withheld artworks worth millions from a German art firm, triggering a string of legal actions that have included a freeze on his assets in England and Wales and other suits from various entities that have claimed ownership of works that may have passed through Philbrick's hands.

In June 2019, members of the art world gossiped about Philbrick selling a small Robert Ryman work for what he had paid a few years earlier at auction just to raise cash. By late summer, his many deal-making partners were beginning to demand satisfaction. And, according to recent lawsuits, when Philbrick ran out of string to kite his deals from one buyer to another, works were revealed to have more owners than previously revealed.

Almost overnight, Philbrick joined the fraternity of art-world high-flyers in the global market with accusations against them. There was Michel Cohen who, after running up considerable debts trading commodities, disappeared in 2000 with $50 million of unpaid obligations to his peers. Larry Salander later topped that with a $120 million fraud that ensnared more than 30 dealers, collectors, and investors. He was sentenced to a prison sentence of 6 to 18 years in 2010. Just last year, Ezra Chowaiki was convicted of wire fraud and sentenced to 18 months in prison for a fraud that hit such art-world stalwarts as dealer Helly Nahmad and collector "Baby Jane" Holzer.

Before Philbrick stopped communicating with lawyers and distressed clients in early November, he appeared on email as the confident dealer brushing off a cascade of allegations that could cause him to lose as much as $100 million.

"There is going to be a lot more to this than has come out yet," Philbrick wrote in an email sent to one of our reporters in late October, after the first lawsuit was filed. "The story is going to be a cautionary one with regards to the professionalization, securitization and legalization of the art world. We are in a period of massive transition where art dealers, collectors, and investors are attempting to turn the arena into one which mimics the worlds of finance and real estate. Alongside this change will naturally come impropriety and the need for increased due caution."

7

"It was a con," attorney Judd Grossman, of the New York firm Grossman LLP, who

represents several individuals who claim to be aggrieved investors, told *ARTnews*. "Whether I'd call it a Ponzi scheme, it's sort of a variation of one, similar to the one perpetrated by Ezra Chowaiki, just on a much grander scale and probably a little more brazen. There were actual transactions taking place, and there were real assets being acquired and sold, but it was all being done against a web of lies."

Grossman continued, "We have one client who Inigo convinced to consign a work to him. Inigo either sold the work and never paid or just stole the work. My guy's out of the work and has no money."

Philbrick had a fairly unique position within the art trade. Although he learned his trade with White Cube founder Jay Jopling at that dealer's gallery and went out on his own with that dealer's backing, Philbrick was more of a dealer-to-dealer salesman than a guy working collectors. Most of Philbrick's creditors were art investors looking to buy works they could hold for a year or two and sell for a decent profit. How did Philbrick convince so many experienced art hands to trust him? Several of those who did business with Philbrick or were offered works describe two very different approaches.

In the beginning, Philbrick was able to make his partners good profits fast, specializing in the rising markets of a few artists. Whether by his own smarts or by good fortune, profits came quickly and easily. When he entered into a deal with a new partner and it was successful, Philbrick was quick to pay. This created two kinds of goodwill—the impression that Philbrick was a dealer with a special touch who would pay on time.

A top-class Madison Avenue dealer who had one neutral brush with Philbrick at an art fair said, "The fact that he was able to get access to [his] material was impressive. The fact that he wasn't paying for it, if that's the case, smacks of desperation. Whether it's a bank putting up the money or a finance company, the trust that they clearly had in him, to give him free rein or the license to do what he was doing, was incredible."

Later, Philbrick switched to another pitch. He would approach the kind of collectors who were interested in getting a good deal, then plead that he was in need of cash and willing to take a loss. For many, the offer was irresistible. One dealer described Philbrick's modus operandi as being "like a big chase," adding that he "seemed to always be under the gun."

"There are a lot of charlatans in the art world," said New York–based private dealer Albert Bitton, who buys and sells art with partners in London and elsewhere but never worked with Philbrick. "Everyone wants to make a fast buck. It's happening much more often lately because everybody wants to be a big player, like a Nahmad or a Mugrabi."

Now those would-be speculators are no longer counting their prospective profits in their heads but wondering how deep their losses will go. "Everyone is just trying to get information on what's actually happening," said one private dealer who claimed he was out "seven figures" from his dealings with Philbrick.

Many observers sitting on the sidelines who believe the allegations made in the pending lawsuits now debate whether Philbrick was an honest dealer who got in over his head or whether his habit of buying goodwill with early profits followed by an abuse of trust was a well-planned strategy.

Even if the court does rule against Philbrick, we may never know. "I sold some works for him," says private dealer and *Baer Faxt* newsletter publisher Josh Baer, "and it was a clean deal." That doesn't mean Baer would vouch for Philbrick, now that the latter dealer has been accused of selling the same work to multiple investors. "If a guy's done it once," he said, "he's done it 20 times."

8

## Trust and Escapes

It is unclear to what degree **Inigo Philbrick**'s downfall was wrapped up in his personal life. Philbrick's move to Miami seems to have been connected to his break up with the London-based Francisca Mancini, a Buenos Aires–born art adviser recently turned perfume maker. The two are listed together as supporters of a 2018 exhibition of work by Danh Vo at the Guggenheim Museum in New York.

ADVERTISEMENT



KEITH SONNIER
*LOUISIANA SUITE*

THROUGH JANUARY 11, 2020

KASMIN

Some saw Mancini as a stabilizing force in Philbrick's life. (She declined to comment for this article.) It seems that, as of October 2018, she and Philbrick were no longer together. That month, Philbrick popped up in a photograph in London with the British reality TV star Victoria Baker Harber, who appeared in the show *Made in Chelsea*. Philbrick appears in Baker Harber's social media as early as July 2018. (Baker Harber did not immediately respond to a request for comment.)

### Related Articles



**Dealer Inigo Philbrick, Subject of Several Pending Lawsuits, May Own $70 M. in Assets**

**In Lawsuit Over Kusama 'Infinity Mirror Room',**

In a February 2019 interview, Baker Harber was asked why she moved to Miami, and she said, presumably speaking of Philbrick, "My boyfriend recently opened a gallery in the design district and we were both tired of London so to pick up and make a move seemed like a good idea."

Philbrick's change of location also seems to have coincided with a change in his business practices—or, at least, so he claimed in the fall of 2018 when he told the *Art Newspaper* that he offered around 20 to 25 third-party guarantees a year on works by artists like Stingel, Wool, Kelley, Richard Prince, and Guyton.

"For me, the best outcome of a guarantee is that you make a lot of money [without buying the work]," he

9

**Mirror Room,**
**German Firm**
**Alleges Dealer Inigo**
**Philbrick Won't**
**Return $14 M. in Art**

make a lot of money [without buying the work], he told the *Art Newspaper*. "Say it's a million dollars that you've risked, then you'd want to make $100,000 to $150,000 as your fee. The second-best outcome is that you get a work you were happy to buy at a price you were happy to own it at. The second-worst outcome is that it sells on one bid and you make $5,000, having put in all this effort to negotiate a deal. [And] the worst outcome is the sort of guarantee you do purely for financial speculation and end up with a painting you don't want to own."

Auction house personnel who did business with Philbrick insist he was always careful to settle his accounts with them promptly. While the lawsuits claim that individual investors might have to wait for their money, the auction houses never did. At this juncture, if the extent of Philbrick's financial constraints that the lawsuits suggest are accurate, it seems unlikely that Philbrick had the resources to guarantee 20–25 works each year or even the ability to cover the several works a season that he might have had to acquire when no other bidders appeared.

With that in mind, Philbrick may not have been entirely candid this past May, when he **told Kelly Crow**, of the *Wall Street Journal*, that he was "experiencing a measure of "guarantee fatigue," and had persuaded one of his clients to offer up two pieces in sales that month without any risk protection. He told the *Journal*, "So far, we've turned down four potential guarantors. But we think the market is hungry and healthy, and if you trust the market, bidders will show up."

That gamble on the market would turn out to be the biggest one of his career, and when the bidders failed to show up, the lawsuits imply, his entire business strategy started unraveling.

Many art-market observers attributed Philbrick's fall in part to changes in the markets of artists whose work he sold, in particular Stingel, Wool, and Guyton.

In October 2011, the same week Philbrick opened Modern Collections, a small "X" painting, by Wade Guyton, *Untitled* (2007), sold in a Sotheby's day sale for £163,250, more than twice its high estimate of £80,000. In 2014 Guyton's market, which had been steadily growing, soared to new heights, with his work selling for up to $6 million at auction and $350,000 on the primary market. The average price of his works at auction went up 240 percent over the previous year. In May 2014, at Sotheby's New York, Philbrick, according to the *Baer Faxt*, was an underbidder on a 2006 "Flaming U" work by Guyton that sold for $6 million, which to this day remains the artist's auction record.

The momentum continued. In November 2015, Philbrick was the winning bidder on a 2005 flaming "U" work at Phillips in New York. He paid $2.4 million for it. "It was an

aggressive estimate," he told the *New York Times* after the sale, saying that he bought the work on behalf of a European collector before adding that "there was competition for the work which I liked."

Since then, there have been fewer competitors bidding for Guyton's work, and his secondary market has leveled off. But most people didn't associate Philbrick with Guyton. As one art advisor put it, Philbrick was "the king of Stingel."

"I'm pretty centrally placed in the Stingel market," he said in a June 2016 *Art Market Monitor* **podcast**, where he also estimated that he had been buying and selling Stingel's work for seven or eight years. (*Art Market Monitor* is owned by the same parent company as *ARTnews*.) "And I'd say that on the secondary side it's fairly rare for paintings to transact without my having some sort of tangential involvement, just because I'm also someone who gets called a lot for advice by both other dealers and collectors. And sometimes I have somebody calling me for advice about a picture they are selling while I'm simultaneously getting someone else calling and asking if it's a good painting and they should buy it."

Stingel's market peaked in May 2017, when a self-portrait, *Untitled (for Sam)*, sold at Christie's New York for a record $10.5 million. In 2018, it was a different story entirely.

This past June, Eileen Kinsella of *Artnet News* **reported** of Stingel's market, "Of 35 works offered at auction since the start of 2018, 8, or 22 percent, were bought in. Roughly the same number of works (34 lots) were offered in 2017, the year the artist's record was set. Four went unsold, while one was withdrawn." Phillips specialist Henry Highley told Kinsella at the time, "You can't have exponential growth at all times and there has been a few points where it's plateaued a bit, which is healthy."

Even a major show of Stingel's work held at the Fondation Beyeler in Switzerland during the apex Art Basel fair last June failed to bring the heat. If the allegations in the lawsuits are true, then a torpid Stingel market was a threat to Philbrick's business strategy, as it began to shut off the supply of new money.

But Philbrick didn't know that in the spring. He had his hopes pinned on the Beyeler exhibition. In an email that appears as an exhibit in the **lawsuit** filed by the German art firm Fine Art Partners (FAP) against Philbrick, the dealer told FAP that a Fondation Beyeler show would push the value of a Stingel painting of Picasso to $14 million, far above the artist's $10 million record set in 2017.

If the claims made by FAP in its lawsuit are true, then Philbrick seems to have risked everything on the Stingel painting selling in Christie's May sale when the Beyeler show was still a tantalizing prospect. If he was, in fact, running his business as FAP alleges, then it is possible that he was counting on scoring with the Picasso so he would have enough cash flow to get his various unsuspecting partners off his back—at least for a little while."

little while.

The end came very slowly, and then all of a sudden, as the Stingel painting sold neither for the $14 million Philbrick promised, nor for the $9 million he claimed, according to FAP's lawsuit, to have received a guarantee for, nor even for the $6.5 million price Christie's posted after the auction because the buyer, dealer Stellan Holm, would end up paying only $1 million of the purchase price before halting payment on his winning bid. A representative for Christie's said the house is awaiting a decision from the court on who owns title to the painting.

It is hard to know whether Philbrick had thought through the squeeze the Stingel Picasso was putting on his arrangement. But the picture's disappointing results set in motion what the lawsuits claim are the key events in exposing the full extent of his dealings. The Stingel sale was clearly the breaking point for FAP. Unsatisfied with the documents Philbrick produced to support his assertion of the $9 million guarantee, FAP, according to its lawsuit, went directly to Christie's to verify his claim. An email from the auction house's general counsel of the Americas, attached as an exhibit to FAP's complaint, stating Christie's belief that the document was not authentic may have helped provoked the lawsuit.

At this point, title to the Stingel Picasso portrait is disputed between FAP; the beneficial owners of Guzzini, an entity that **claims it bought the painting** for $6 million, along with two other works; and the company Satfinance, which believes it, too, has an ownership interest.

In the June 2016 *Art Market Monitor* podcast, Philbrick spoke about the importance of trust between himself and other dealers and advisors who might be involved in a deal. "For me the ideal thing is that you have trust with the person you are talking to, and because you two have this great relationship, it saves me the work of having to have a great relationship with the person that you already have a great relationship with."

In light of the claims made in the FAP lawsuit and the media coverage that has resulted, Philbrick has likely lost that trust. The once-impressive young man's name has become notorious, a byword for another potential art-market scandal. "I was a client, like all his close friends," Schachter said. "I was a victim."

Even Jopling, who did so much to launch Philbrick's career and seems to have trusted him far longer than might have been prudent, expressed dismay at his downfall. "I am aware of the serious allegations made against Mr. Inigo Philbrick," he wrote in an email. "It has hurt and saddened me to learn that Mr. Philbrick, whom I respected and whose early career I supported, has not only betrayed my trust but, it appears, that of many others. We are privileged in our industry to work closely with the artists and art that we love. I am enormously disappointed that Mr. Philbrick appears to have abused this position of privilege."

12

He added, "I was shocked to discover the allegations of serious wrongdoing by Mr. Philbrick in U.S. media reports in October 2019. At the earliest possible opportunity, I applied for an injunction against Mr. Philbrick to protect my interests."

**Correction, 12/4/2019, 12:05 p.m.:** *A previous version of this article misstated details about a Stingel work that Philbrick acquired in May 2015. The untitled work was dated 1996, not 2000, and he bought it for $1.7 million, not $1.15 million. This article has been edited to reflect this.*

13

# EXHIBIT B

# M O D E R N   C O L L E C T I O N S

89 Mount Street  London W1K 2SR  Great Britain
+44 (0)20 7036 1590
moderncollections.net

Andre Sakhai
10 Windsor Drive
Old Westbury
NY 11568
United States

25 July 2012

| Invoice - MOD208 | USD |
| --- | --- |

Wade Guyton
Untitled
2007
Epson UltraChrome inkjet on linen
83 7/8 x 68 7/8 in. (213 x 175 cm)  585,000.00

| | |
| --- | --- |
| Sub total | 585,000.00 |
| Tax - out of EEC (0%) | 0.00 |
| Total Payable | 585,000.00 |
| Payments | 0.00 |
| Balance | 585,000.00 |

50% due on receipt of invoice.
50% due on 10 September 2012.
Please see the following page for the terms.

| | |
| --- | --- |
| Bank | Nat West Bank, 5 Market Place, Kingston upon Thames, Surrey, KT1 1JX |
| Sort code | 60-60-02 |
| Account | Modern Collections LLP |
| Account no. | |
| Iban | |
| Swift Code | |
| VAT No. | |



**15**

Registered in British Columbia, Canada No LL0370

Terms

Please quote the invoice number on payment instructions.
Payment must be made in the currency indicated on the invoice.

1.  The sale is made on the terms in this invoice and those set out in the email confirming sale, all of which form part of the contract.

2.  Title to the artwork (the "Work") does not pass until payment of the Purchase Price has been received in full by Modern Collections in cleared funds.

3.  From the time and date title passes to the Purchaser, the Purchaser will be responsible for the Work and any maintenance and the risk of damage to it or loss of it will pass to the Purchaser. The Purchaser must therefore make appropriate arrangements to insure the Work from this time.

4.  Where goods are being exported, proof of export is required within three months of the date of this invoice.

5.  These terms and conditions may only be varied by written agreement between the Purchaser and Modern Collections.

6.  English law shall apply to the whole of these terms and conditions (including any non-contractual obligation related to these terms and conditions). The Purchaser and Modern Collections agree as follows in relation to jurisdiction:

    a.  save as specified at paragraph 17(b) below, the English courts shall have exclusive jurisdiction in relation to any dispute arising out of or in connection with these terms and conditions and any legal proceedings in relation thereto and the Purchaser waives any objection to any such proceedings being brought in those courts on the grounds of venue or on the grounds that the proceedings have been brought in an inconvenient forum;
    b.  for the benefit of Modern Collections only, Modern Collections shall have the right to bring proceedings against the Purchaser in any other court which has jurisdiction.

16

# EXHIBIT C

# V & A GALLERY

**INVOICE**                                                July 1st, 2013
Inigo Philbrick
Modern Collections
89 Mount Street London
W1S 2SR

---

**Wade Guyton**                                            **$350,000**
Untitled, 2006
Medium Epson UltraChrome inkjet on linen
90 x 53 inches

50% Ownership



50% of this work + $350,000 is exchanged for Wade Guyton, Untitled 2007
(In lieu of payment for $1,200,000. Previous invoice attached).

Subtotal:        $350,000

**Total:**        **$350,000**

Payment is due upon receipt of this invoice. Title will not pass until payment is
received in full. Shipping and insurance are the responsibility of the purchaser.
The payment of any applicable use tax is the sole responsibility of the purchaser.
If payment is not made upon receipt of this invoice, the sale is null and void.

39 CUTTERMILL RD GREAT NECK NY 11021 - (P) 516-487-1999 (F) 516-487-
3095                                                                    18

Account Name
V & A Gallery
Account # █████████
Routing number # ███████████
Bank name and address
TD Bank
260 Park Avenue South
New York, NY 10010

39 CUTTERMILL RD GREAT NECK NY 11021 - (P) 516-487-1999 (F) 516-487-3095     **19**

# *V & A GALLERY*

**INVOICE**                                                July 1st, 2013
Inigo Philbrick
Modern Collections
89 Mount Street
London W1S 2SR

---

**Wade Guyton**                                          **$1,200,000.00**
Untitled, 2007
Epson Ultra Chrome inkjet on linen
213 x 175 cm (83 7/8 x 68 7/8 inches)



Subtotal:        $1,200,000.00

**Total:**        **$1,200,000.00**

Payment is due upon receipt of this invoice. Title will not pass until payment is received in full. Shipping and insurance are the responsibility of the purchaser. The payment of any applicable use tax is the sole responsibility of the purchaser. If payment is not made upon receipt of this invoice, the sale is null and void.

**Account Name**
**V & A Gallery**
**Account #** ▓▓▓▓▓▓▓▓
**Routing number #** ▓▓▓▓▓▓▓
**Bank name and address**
**TD Bank**
**260 Park Avenue South**
**New York, NY 10010**

# EXHIBIT D



## Terms of Guyton U co-ownership

**Inigo Philbrick** <inigo@moderncollections.net>                                    Sat, Jun 29, 2013 at 3:26 PM
Reply-To: inigo@moderncollections.net
To: andre sakhai <andresak11@gmail.com>

Andre,

So that we have it in writing - we are buying together a large format (90 x 53 in) 2006 Flaming U.

We are 50/50 owners of the work, but upon sale you will return 850k and I will return 700k, and then we split the profit.

You are trading your Guyton X into the deal - receiving the stake in the U and 350k USD.

Glad to be partners.

Speak soon,

I

--

___
Inigo Philbrick
Mobile: +44 7802 466 254

22

# EXHIBIT E

# Guzzini Properties Limited

Company number: 284618
Registered address: Patton, Moreno & Asvat (BVI) Limited, 2nd Floor, O'Neal Marketing Associates Building,
P O Box 3174, Wickham's Cay II, Road Town, Tortola, BVI
Correspondence address: c/o Reuben Brothers SA, 9 Place du Molard, 1204 Geneva, Switzerland

Inigo Philbrick Ltd
55 Grosvenor Street
London W1K 3HY ___28___ August 2018

Dear Sirs

**Sale and purchase agreement – Stingel, Guyton, Wool (the "Agreement")**

## 1. INTERPRETATION

We refer to the Agreement dated 28 June 2017. Terms defined in the Agreement shall, unless the context requires otherwise, have the same meaning when used in this letter.

## 2. EXTENSION OF AGREEMENT

(a) Pursuant to Clause 7 (*Termination and Post-Termination*) of the Agreement, I can confirm that Guzzini Properties Ltd are prepared to extend the Termination date for 1 (one) year, being an expiry date of 28 August 2019, subject to all outstanding sums under the existing agreement ($599,000) being paid.

(b) Upon signing of this Extension a further Option Fee of $10,000 will become immediately payable by the Seller.

(c) References in the Agreement to 2017 are updated to be read as 2018 and references to 2018 are updated to be read as 2019.

(d) All other terms of the Agreement are to remain in full force and effect.

## 3. GENERAL

(a) This letter is a Finance Document.

(b) This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

(c) Please sign and return the enclosed copy of this letter to us within 7 (seven) Business Days to confirm your agreement with its terms.

Yours faithfully

For and on behalf of      We hereby acknowledge and agree to the terms of this letter
**Guzzini Properties Limited**      **Inigo Philbrick Limited**
(in its capacity as Buyer)      (in its capacity as Seller)

24

This **Agreement** is made the      day of June 2017

**BETWEEN**:

(1)      **INIGO PHILBRICK LIMITED**, a company registered in England with company number 09053929 and registered address 55 Grosvenor Street, London W1K 3HY(the "**Seller**"); and

(2)      **GUZZINI PROPERTIES LIMITED**, a company registered in the British Virgin Islands with registered address 197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands (the "**Buyer**").

Each a "**Party**" and together the "**Parties**".

**RECITALS**

(A)      The Seller has agreed to sell the Artworks (as defined below) and the Buyer has agreed to purchase the Artworks upon the terms and conditions set out in this Agreement.

(B)      The Buyer has agreed that the Seller has the option to buy back the Artworks and may exercise that option on and subject to the terms and conditions set out in this Agreement.

**It is agreed:**

1.      **DEFINITIONS**

| | |
|---|---|
| **Artworks** | means the three artworks set out in Schedule 1 to this Agreement. |
| **Business Day** | means a day (other than a Saturday, Sunday or public holiday) when banks in London are open for business. |
| **Option Fee** | means a fee of US$10,000 payable by the Seller in relation to the Buyer granting the buy-back options as set out in clause 5. |
| **Purchase Price** | means the sum of US$6,000,000 (Six million US dollars), inclusive of any taxes and duties |
| **Seller's Bank Account** | means |

| | |
|---|---|
| Bank Name: | Santander |
| Account Name: | Inigo Philbrick Limited |
| Account Number: | ████████ |
| Sort code: | ████████ |
| IBAN: | ████████ |
| Swift code: | ████████████ |

25

| **Tax or Taxation:** | whether or not directly or primarily chargeable against or attributable to the Artworks: |
|---|---|

(a) any form of tax, levy, impost, duty, contribution, customs and other import duties, liability and charge in the nature of taxation and all related withholdings or deductions of any kind wherever and whenever payable and shall further include any amount payable as a consequence of any claim, direction order or determination of any Taxation Authority; and

(b) all fines, penalties, charges, costs and interest included in or relating to any of the above or to any obligation in respect of any of the above.

| **Taxation Authority:** | any government, state or municipality or any local, state, federal or other fiscal, revenue, customs or excise authority, body or official competent to impose, administer, levy, assess or collect Tax. |
|---|---|

| **Tax Claim:** | in each case from which it appears that there is, or is likely to be, a liability or increased liability in respect of the Artworks in respect of which the Seller may be liable in respect of Tax: |
|---|---|

(a) any assessment, self-assessment, notice, letter, determination, demand or other document issued or action taken by or on behalf of any Taxation Authority (whether issued or taken before or after the date of this agreement and whether satisfied or not at the date of this agreement) including, for the avoidance of doubt, the imposition of any withholding of or on account of tax; and

(b) the preparation or submission to a Taxation Authority of any return, amended return, computation, accounts or any other documents by the Buyer, or another person.

| **Zurich Storage Facility** | means Moebel-Transport AG, Im Hackacker 4, 8902 Urdorf, Switzerland |
|---|---|

2. **AGREEMENT TO SELL AND PURCHASE**

On and subject to the terms and conditions of this Agreement and in consideration of the payment by the Buyer of the Purchase Price, the Seller hereby sells to the Buyer all legal and beneficial ownership in the Artworks and the Buyer hereby agrees to buy the Artworks.

3. **TERMS AND CONDITIONS OF SALE**

26

3.1  The Option Fee shall be payable by the Seller to the Buyer upon signature of this agreement by both Parties.

3.2    The Seller shall provide to the Buyer an invoice in the form of Schedule 2 within 5 Business Days of signature of this Agreement by both Parties.

3.3    The Buyer shall transfer the Purchase Price to the Seller's Bank Account within 5 Business Days of receipt of the Seller's invoice.

3.4    Legal and beneficial title in the Artworks shall transfer to the Buyer upon the Buyer's payment of the Purchase Price to the Seller.

3.5    The Artworks shall remain in the Zurich Storage Facility. Upon receipt of the Purchase Price, the Seller shall send to the Zurich Storage Facility a letter in the form appended at Schedule 3 transferring full control and possession of and access to the Artworks to the Buyer.

3.6    Subject to termination of this Agreement as set out in clause 7, the Seller shall continue to pay the costs of storage of the Artworks

3.7    While this Agreement remains in force, the Seller shall be responsible for the costs of insuring the Artworks with a reputable art insurer approved by the Buyer for not less than the value of each as set out in Schedule 1. The Buyer shall be named as loss payee on the Seller's insurance policy and the Seller shall provide copies of insurance certificates evidencing the same.

## 4.    WARRANTIES AND INDEMNITY

4.1    The Seller represents and warrants the following:

4.1.1    The Seller has full legal and beneficial title to the Artworks and is entitled without further action to transfer the legal and beneficial title in the Artworks to the Buyer on the terms of this Agreement without the consent of any third party.

4.1.2    The Seller will transfer the Artworks with full title guarantee in the Artworks, free from all encumbrances to the Buyer and to complete the transactions contemplated in this Agreement including, without limitation, to transfer title in the Artworks in accordance with the provisions of this Agreement.

4.1.3    The Artworks are and will remain free of all liens, charges, encumbrances or any other third party claims including but not limited to Tax Claims.

4.1.4    All applicable laws, regulations and requirement relating to the Artworks' export and import have been complied with including any applicable VAT regulations. In the event that it subsequently emerges that any such laws and regulations have not been complied with the Seller will be responsible for any resulting financial loss, including but not limited to any penalties and interest that may accrue.

4.1.5    The Artworks are the authentic and original Artworks created by the artists identified in Schedule 1 at or about the date indicated in Schedule 1 as the dates of creation and the Artworks are not replicas, reproductions or forgeries thereof and the Seller is not aware of any claim by any person to such effect.

4.1.6    The Seller has provided the Buyer with all information in its knowledge which is true and accurate regarding the provenance, condition, attribution, description, alterations and restoration of the Artworks and the Seller is not aware of any challenges or disputes (past, pending or threatened) relating thereto.

27

4.1.7   The Seller has the full legal authority to enter into this Agreement, to make and give the representation and warranties herein and to agree to and enter into the other terms and provisions contained in this Agreement.

4.2   The Seller acknowledges that the Buyer will be relying on the representations and warranties it has given under the terms of this Agreement and the Seller will indemnify the Buyer against all claims, actions, losses, liabilities, and costs which may arise out of any action whatsoever connected to the Artworks arising out of, based upon or resulting from:

4.2.1   any act or omission by the Seller relating to or affecting the sale or purchase of the Artworks; and;

4.2.2   any breach or alleged breach by the Seller of any obligations, representations or warranties contained in this Agreement.

## 5.   SELLER'S OPTION TO BUY BACK THE ARTWORKS

5.1   The Seller has the option to buy back the Artworks from the Buyer and may exercise that option on the terms set out in this clause 5.

5.2   The Buyer undertakes not to sell the Artworks until any option for the Seller to buy back the Artworks under this clause 5 has expired.

5.3   The Seller may confirm in writing to the Buyer between the period starting 27 June 2017 and ending 27 August 2018 that it wishes to buy the Artworks on the following terms:

5.3.1   If the Buyer receives the Seller's written confirmation that it wishes to exercise the option to buy back the Artworks no later than 27 June 2018, the Seller's purchase price will be US$6,590,000 (Six million five hundred ninety thousand US dollars) (the "Early Buy-back Price"); or

5.3.2   If the Buyer received the Seller's written confirmation that it wishes to exercises the option to buy back the Artworks after 27 June 2018 and no later than 27 August 2018, the Seller's purchase price will be US$6,740,000 (Six million seven hundred forty thousand US dollars) (the "Late Buy-back Price").

5.4   The Seller's option to buy back the Artworks expires after 27 August 2018.

5.5   Upon the Buyer's receipt of either the Early Buy-back Price or the Late Buy-back Price as may be applicable and the Option Fee, legal and beneficial title in the Artworks shall transfer to the Seller, subject to such monies being received by the Buyer prior to 27 August 2018.

5.6   Subject to clause 5.6, the Buyer shall send to the Zurich Storage Facility a letter in the form appended at Schedule 4 transferring full control and possession of and access to the Artworks to the Seller.

## 6.   CONFIDENTIALITY

The Seller and the Buyer acknowledge that the provisions and subject matter of this Agreement, including but not limited to the identity of the Seller, the identity of the Buyer, details of the Artworks and the Purchase Price, are confidential and the Parties agree not to disclose any of the foregoing information to any person or party, except as may be required by law or regulation, whether concurrent with or subsequent to the execution and delivery

28

of this Agreement. Notwithstanding the foregoing, the Parties may disclose the terms of this Agreement to their respective legal advisers, financial and other advisers, and accountants to the extent necessary to fulfil their legal or financial obligations.

## 7.    TERMINATION AND POST-TERMINATION

7.1    Subject to clause 7, this Agreement will terminate no later than 28 August 2018 or on the Seller's exercising its option to buy back the Artworks, whichever is the earlier.

7.2    The warranties and indemnity included in this Agreement and the Parties' obligations in relation to confidentiality survive termination.

7.3    If the Seller has not exercised the option to buy back the Artworks in accordance with clause 5 above, the Seller's obligations to pay for storage, insurance and any other expenses relating to the Artworks shall cease on 28 August 2018.

## 8.    MISCELLANEOUS

8.1    This Agreement represents the entire understanding of all the Parties hereto with regard to its subject matter and supersedes any and all other and prior agreements between the Parties in relation to such matters. Nothing in this Agreement shall, however, operate to limit or exclude any liability for fraud or fraudulent misrepresentation.

8.2    The terms of this Agreement may not be modified or amended, except in a writing signed by the Parties.

8.3    This Agreement shall inure to the benefit of, and shall be binding upon, the successors, heirs, executors and administrators of the Parties hereto. The Parties may not assign, transfer, charge or deal with this Agreement or all or any part of the benefit of, or the rights and benefits under this Agreement, except with the prior written consent of the other Party.

8.4    If any provision of this Agreement is so found to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted, the provision in question shall apply with such modification(s) as may be necessary to make it valid and enforceable in the relevant jurisdiction but shall continue to apply without any modification in all other relevant jurisdictions.

8.5    Any notice required to be given pursuant to this Agreement shall be in writing.

8.6    The Parties agree that the terms of this Agreement are not enforceable by any third party under the Contracts (Rights of Third Parties) Act 1999.

8.7    This Agreement and any dispute or claim arising out of or in connection with it or its subject matter (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

8.8    The Parties irrevocably agree to submit to the exclusive jurisdiction of the courts of England over any claim or matter arising under or in connection with this Agreement (including non-contractual disputes or claims).

8.9    This Agreement may be executed in counterparts all of which taken together shall 29 constitute a single instrument.

**SIGNED** on behalf of **INIGO PHILBRICK LIMITED**

| Signature |
| --- |
| Director |
| Print name |

**SIGNED** on behalf of **GUZZINI PROPERTIES LIMITED**

| Signature |
| --- |
| Director |
| Print name |

30

**Schedule 1**

**Artworks**



Title: *Untitled*

Artist: Rudolf Stingel

Date: 2012

Medium: Oil on canvas

Dimensions: 241.3 x 193 cms

Signed by the artist

Insured value: US$10,000,000


Provenance:    Gagosian Gallery, New York

               Private Collection, Russia

               Inigo Philbrick Limited


Exhibited:     PicassoMania, Le Grand Palais, Paris, 7 October 2015 - 29 February 2016


31



Title: *Untitled*

Artist: Wade Guyton

Date: 2006

Medium: Epson UltraChrome inkjet on linen

Dimensions: 226.1 x 137.2 cms

Insured value: US$6,000,000

Provenance:   Petzel Gallery, New York; Private Collection, Belgium

Inigo Philbrick Limited

Exhibited:    23 February – 25 March 2006, *Color, Power & Style*, Petzel Gallery, New York;

4 October 2012 – 13 January 2013, Whitney Museum of American Art, New York

32



39447947_1.jpg
Type: JPEG image
Size: 88.5 KB
Dimension: 333 x 420 pixels

Title: *Untitled (P604)*

Artist: Christopher Wool

Date: 2009

Medium: Enamel on linen

Dimensions: 304.8 x 243.84 cms

Insured value: US$9,000,000

Provenance:   Max Hetzler Gallery

          Private Collection, Switzerland

          Private Collection, London

          Inigo Philbrick Limited

33

## Schedule 2

## Pro Forma Invoice

[Inigo Philbrick Limited letterhead]

[x] June 2017

Invoice No. [x]

Guzzini Properties Limited

197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands

### PRO FORMA INVOICE

**Rudolf Stingel**

*Untitled,* 2012 (Picasso portrait)

Oil on canvas

241.3 x 193 cms

**Wade Guyton**

*Untitled*, 2006

Epson UltraChrome inkjet on linen

226.1 x 137.2 cms

**Christopher Wool**

*Untitled (P604)*, 2009

Enamel on linen

304.8 x 243.84 cms

**TOTAL:**                                   **US$6,000,000.00**

To be paid in full no later than [date].

34

Title passes on payment in full being made. This invoice is governed by English law.

**Schedule 3**

**Letter to Zurich Storage Facility**

[Inigo Philbrick Limited letterhead]

[Date]

The Directors
Möbel Transport AG
Gaswerkareal
Zurich CH 8010
Switzerland

Dear Sirs

RE: *Untitled*, 2012 (Picasso portrait) by Rudolf Stingel; *Untitled*, 2006 by Wade Guyton; and *Untitled (P604)*, 2009 by Christopher Wool (the "**Artworks**")

We write on behalf of Guzzini Properties Limited in relation to the above named Artworks, identified by tracking numbers 53195, 13107 and [x] respectively and located at Im Hackacker 4, 8902 Urdorf, stored by us at your premises on 31 January 2017, 29 April 2014 and [x] respectively.

You are instructed to hold the Artworks for the benefit of Guzzini Properties Limited to which legal and beneficial title in the Paintings has been transferred. The Paintings will remain in our storage facility at our expense but may only be moved or removed from storage with the sole express written approval of Guzzini Properties Limited.

Please sign and return a copy of this letter to acknowledge the above instructions.

For your information, the contact information for Guzzini Properties Limited is as follows:

Mr Alexander Bushaev
197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands
E-mail: abushaev@reubros.com

Yours faithfully,


Inigo Philbrick

For and on behalf of Inigo Philbrick Limited

_____

Read, agreed and accepted by


------------------------------------------------------        _____        **35**
[name], Director                                               Date

For and on behalf of Möbel Transport AG.

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
NYSCEF DOC. NO.     Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 84 of 127   RECEIVED NYSCEF: 02/28/2020

INDEX NO. 651300/2020

**Schedule 4**

**Letter to Zurich Storage Facility**

[Guzzini Properties Limited letterhead]

[Date]

The Directors
Möbel Transport AG
Gaswerkareal
Zurich CH 8010
Switzerland

Dear Sirs

RE: *Untitled*, 2012 (Picasso portrait) by Rudolf Stingel; *Untitled*, 2006 by Wade Guyton; and *Untitled (P604)*, 2009 by Christopher Wool (the "**Artworks**")

We write on behalf of Inigo Philbrick Limited in relation to the above named Artworks, identified by tracking numbers 53195, 13107 and [x] respectively and located at Im Hackacker 4, 8902 Urdorf, stored by Inigo Philbrick Limited at your premises on 31 January 2017, 29 April 2014  and [x] respectively.

You are instructed to hold the Artworks for the benefit of Inigo Philbrick Limited to which legal and beneficial title in the Paintings has been transferred. The Paintings may only be moved or removed from storage with the sole express written approval of Inigo Philbrick Limited.

Please sign and return a copy of this letter to acknowledge the above instructions.

Yours faithfully,


Alexander Bushaev

For and on behalf of Guzzini Properties Limited


_____


Read, agreed and accepted by



----------------------------------------------------
[name], Director                                        Date _____

For and on behalf of Möbel Transport AG.

36

# EXHIBIT 4

# Guzzini Properties Limited

Company number: 284618
Registered address: Patton, Moreno & Asvat (BVI) Limited, 2ⁿᵈ Floor, O'Neal Marketing Associates Building,
P O Box 3174, Wickham's Cay II, Road Town, Tortola, BVI
Correspondence address: c/o Reuben Brothers SA, 9 Place du Molard, 1204 Geneva, Switzerland

Inigo Philbrick Ltd
55 Grosvenor Street
London W1K 3HY                                                        28 August 2018

Dear Sirs

**Sale and purchase agreement – Stingel, Guyton, Wool (the "Agreement")**

1. **INTERPRETATION**

   We refer to the Agreement dated 28 June 2017. Terms defined in the Agreement shall, unless the context requires otherwise, have the same meaning when used in this letter.

2. **EXTENSION OF AGREEMENT**

   (a)   Pursuant to Clause 7 (*Termination and Post-Termination*) of the Agreement, I can confirm that Guzzini Properties Ltd are prepared to extend the Termination date for 1 (one) year, being an expiry date of 28 August 2019, subject to all outstanding sums under the existing agreement ($599,000) being paid.

   (b)   Upon signing of this Extension a further Option Fee of $10,000 will become immediately payable by the Seller.

   (c)   References in the Agreement to 2017 are updated to be read as 2018 and references to 2018 are updated to be read as 2019.

   (d)   All other terms of the Agreement are to remain in full force and effect.

3. **GENERAL**

   (a)   This letter is a Finance Document.

   (b)   This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

   (c)   Please sign and return the enclosed copy of this letter to us within 7 (seven) Business Days to confirm your agreement with its terms.

Yours faithfully

_____          _____
For and on behalf of              We hereby acknowledge and agree to the terms of this letter
**Guzzini Properties Limited**    **Inigo Philbrick Limited**
(in its capacity as Buyer)        (in its capacity as Seller)

This **Agreement** is made the    day of June 2017

**BETWEEN**:

(1)  **INIGO PHILBRICK LIMITED**, a company registered in England with company number 09053929 and registered address 55 Grosvenor Street, London W1K 3HY(the "**Seller**"); and

(2)  **GUZZINI PROPERTIES LIMITED**, a company registered in the British Virgin Islands with registered address 197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands (the "**Buyer**").

Each a "**Party**" and together the "**Parties**".

**RECITALS**

(A)  The Seller has agreed to sell the Artworks (as defined below) and the Buyer has agreed to purchase the Artworks upon the terms and conditions set out in this Agreement.

(B)  The Buyer has agreed that the Seller has the option to buy back the Artworks and may exercise that option on and subject to the terms and conditions set out in this Agreement.

**It is agreed:**

1.  **DEFINITIONS**

| | |
|---|---|
| **Artworks** | means the three artworks set out in Schedule 1 to this Agreement. |
| **Business Day** | means a day (other than a Saturday, Sunday or public holiday) when banks in London are open for business. |
| **Option Fee** | means a fee of US$10,000 payable by the Seller in relation to the Buyer granting the buy-back options as set out in clause 5. |
| **Purchase Price** | means the sum of US$6,000,000 (Six million US dollars), inclusive of any taxes and duties |
| **Seller's Bank Account** | means |

| | |
|---|---|
| Bank Name: | Santander |
| Account Name: | Inigo Philbrick Limited |
| Account Number: | 00053379 |
| Sort code: | 09-07-15 |
| IBAN: | ABBYGB2L |
| Swift code: | GB06 ABBY09071500053379 |

| **Tax or Taxation:** | whether or not directly or primarily chargeable against or attributable to the Artworks: |
|---|---|
| | (a) any form of tax, levy, impost, duty, contribution, customs and other import duties, liability and charge in the nature of taxation and all related withholdings or deductions of any kind wherever and whenever payable and shall further include any amount payable as a consequence of any claim, direction order or determination of any Taxation Authority; and |
| | (b) all fines, penalties, charges, costs and interest included in or relating to any of the above or to any obligation in respect of any of the above. |
| **Taxation Authority:** | any government, state or municipality or any local, state, federal or other fiscal, revenue, customs or excise authority, body or official competent to impose, administer, levy, assess or collect Tax. |
| **Tax Claim:** | in each case from which it appears that there is, or is likely to be, a liability or increased liability in respect of the Artworks in respect of which the Seller may be liable in respect of Tax: |
| | (a) any assessment, self-assessment, notice, letter, determination, demand or other document issued or action taken by or on behalf of any Taxation Authority (whether issued or taken before or after the date of this agreement and whether satisfied or not at the date of this agreement) including, for the avoidance of doubt, the imposition of any withholding of or on account of tax; and |
| | (b) the preparation or submission to a Taxation Authority of any return, amended return, computation, accounts or any other documents by the Buyer, or another person. |
| **Zurich Storage Facility** | means Moebel-Transport AG, Im Hackacker 4, 8902 Urdorf, Switzerland |

2.   **AGREEMENT TO SELL AND PURCHASE**

On and subject to the terms and conditions of this Agreement and in consideration of the payment by the Buyer of the Purchase Price, the Seller hereby sells to the Buyer all legal and beneficial ownership in the Artworks and the Buyer hereby agrees to buy the Artworks.

3.   **TERMS AND CONDITIONS OF SALE**

3.1   The Option Fee shall be payable by the Seller to the Buyer upon signature of this agreement by both Parties.

3.2    The Seller shall provide to the Buyer an invoice in the form of Schedule 2 within 5 Business Days of signature of this Agreement by both Parties.

3.3    The Buyer shall transfer the Purchase Price to the Seller's Bank Account within 5 Business Days of receipt of the Seller's invoice.

3.4    Legal and beneficial title in the Artworks shall transfer to the Buyer upon the Buyer's payment of the Purchase Price to the Seller.

3.5    The Artworks shall remain in the Zurich Storage Facility. Upon receipt of the Purchase Price, the Seller shall send to the Zurich Storage Facility a letter in the form appended at Schedule 3 transferring full control and possession of and access to the Artworks to the Buyer.

3.6    Subject to termination of this Agreement as set out in clause 7, the Seller shall continue to pay the costs of storage of the Artworks

3.7    While this Agreement remains in force, the Seller shall be responsible for the costs of insuring the Artworks with a reputable art insurer approved by the Buyer for not less than the value of each as set out in Schedule 1. The Buyer shall be named as loss payee on the Seller's insurance policy and the Seller shall provide copies of insurance certificates evidencing the same.

## 4.    WARRANTIES AND INDEMNITY

4.1    The Seller represents and warrants the following:

4.1.1    The Seller has full legal and beneficial title to the Artworks and is entitled without further action to transfer the legal and beneficial title in the Artworks to the Buyer on the terms of this Agreement without the consent of any third party.

4.1.2    The Seller will transfer the Artworks with full title guarantee in the Artworks, free from all encumbrances to the Buyer and to complete the transactions contemplated in this Agreement including, without limitation, to transfer title in the Artworks in accordance with the provisions of this Agreement.

4.1.3    The Artworks are and will remain free of all liens, charges, encumbrances or any other third party claims including but not limited to Tax Claims.

4.1.4    All applicable laws, regulations and requirement relating to the Artworks' export and import have been complied with including any applicable VAT regulations. In the event that it subsequently emerges that any such laws and regulations have not been complied with the Seller will be responsible for any resulting financial loss, including but not limited to any penalties and interest that may accrue.

4.1.5    The Artworks are the authentic and original Artworks created by the artists identified in Schedule 1 at or about the date indicated in Schedule 1 as the dates of creation and the Artworks are not replicas, reproductions or forgeries thereof and the Seller is not aware of any claim by any person to such effect.

4.1.6    The Seller has provided the Buyer with all information in its knowledge which is true and accurate regarding the provenance, condition, attribution, description, alterations and restoration of the Artworks and the Seller is not aware of any challenges or disputes (past, pending or threatened) relating thereto.

4.1.7    The Seller has the full legal authority to enter into this Agreement, to make and give the representation and warranties herein and to agree to and enter into the other terms and provisions contained in this Agreement.

4.2    The Seller acknowledges that the Buyer will be relying on the representations and warranties it has given under the terms of this Agreement and the Seller will indemnify the Buyer against all claims, actions, losses, liabilities, and costs which may arise out of any action whatsoever connected to the Artworks arising out of, based upon or resulting from:

4.2.1    any act or omission by the Seller relating to or affecting the sale or purchase of the Artworks; and;

4.2.2    any breach or alleged breach by the Seller of any obligations, representations or warranties contained in this Agreement.

## 5.    SELLER'S OPTION TO BUY BACK THE ARTWORKS

5.1    The Seller has the option to buy back the Artworks from the Buyer and may exercise that option on the terms set out in this clause 5.

5.2    The Buyer undertakes not to sell the Artworks until any option for the Seller to buy back the Artworks under this clause 5 has expired.

5.3    The Seller may confirm in writing to the Buyer between the period starting 27 June 2017 and ending 27 August 2018 that it wishes to buy the Artworks on the following terms:

5.3.1    If the Buyer receives the Seller's written confirmation that it wishes to exercise the option to buy back the Artworks no later than 27 June 2018, the Seller's purchase price will be US$6,590,000 (Six million five hundred ninety thousand US dollars) (the "Early Buy-back Price"); or

5.3.2    If the Buyer received the Seller's written confirmation that it wishes to exercises the option to buy back the Artworks after 27 June 2018 and no later than 27 August 2018, the Seller's purchase price will be US$6,740,000 (Six million seven hundred forty thousand US dollars) (the "Late Buy-back Price").

5.4    The Seller's option to buy back the Artworks expires after 27 August 2018.

5.5    Upon the Buyer's receipt of either the Early Buy-back Price or the Late Buy-back Price as may be applicable and the Option Fee, legal and beneficial title in the Artworks shall transfer to the Seller, subject to such monies being received by the Buyer prior to 27 August 2018.

5.6    Subject to clause 5.6, the Buyer shall send to the Zurich Storage Facility a letter in the form appended at Schedule 4 transferring full control and possession of and access to the Artworks to the Seller.

## 6.    CONFIDENTIALITY

The Seller and the Buyer acknowledge that the provisions and subject matter of this Agreement, including but not limited to the identity of the Seller, the identity of the Buyer, details of the Artworks and the Purchase Price, are confidential and the Parties agree not to disclose any of the foregoing information to any person or party, except as may be required by law or regulation, whether concurrent with or subsequent to the execution and delivery

of this Agreement. Notwithstanding the foregoing, the Parties may disclose the terms of this Agreement to their respective legal advisers, financial and other advisers, and accountants to the extent necessary to fulfil their legal or financial obligations.

## 7. TERMINATION AND POST-TERMINATION

7.1 Subject to clause 7, this Agreement will terminate no later than 28 August 2018 or on the Seller's exercising its option to buy back the Artworks, whichever is the earlier.

7.2 The warranties and indemnity included in this Agreement and the Parties' obligations in relation to confidentiality survive termination.

7.3 If the Seller has not exercised the option to buy back the Artworks in accordance with clause 5 above, the Seller's obligations to pay for storage, insurance and any other expenses relating to the Artworks shall cease on 28 August 2018.

## 8. MISCELLANEOUS

8.1 This Agreement represents the entire understanding of all the Parties hereto with regard to its subject matter and supersedes any and all other and prior agreements between the Parties in relation to such matters. Nothing in this Agreement shall, however, operate to limit or exclude any liability for fraud or fraudulent misrepresentation.

8.2 The terms of this Agreement may not be modified or amended, except in a writing signed by the Parties.

8.3 This Agreement shall inure to the benefit of, and shall be binding upon, the successors, heirs, executors and administrators of the Parties hereto. The Parties may not assign, transfer, charge or deal with this Agreement or all or any part of the benefit of, or the rights and benefits under this Agreement, except with the prior written consent of the other Party.

8.4 If any provision of this Agreement is so found to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted, the provision in question shall apply with such modification(s) as may be necessary to make it valid and enforceable in the relevant jurisdiction but shall continue to apply without any modification in all other relevant jurisdictions.

8.5 Any notice required to be given pursuant to this Agreement shall be in writing.

8.6 The Parties agree that the terms of this Agreement are not enforceable by any third party under the Contracts (Rights of Third Parties) Act 1999.

8.7 This Agreement and any dispute or claim arising out of or in connection with it or its subject matter (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

8.8 The Parties irrevocably agree to submit to the exclusive jurisdiction of the courts of England over any claim or matter arising under or in connection with this Agreement (including non-contractual disputes or claims).

8.9 This Agreement may be executed in counterparts all of which taken together shall constitute a single instrument.

**SIGNED** on behalf of **INIGO PHILBRICK LIMITED**

| Signature |
| --- |
| Director |
| Print name |

**SIGNED** on behalf of **GUZZINI PROPERTIES LIMITED**

| Signature |
| --- |
| Director |
| Print name |

**Schedule 1**

**Artworks**



Title: *Untitled*

Artist: Rudolf Stingel

Date: 2012

Medium: Oil on canvas

Dimensions: 241.3 x 193 cms

Signed by the artist

Insured value: US$10,000,000


Provenance:   Gagosian Gallery, New York

              Private Collection, Russia

              Inigo Philbrick Limited


Exhibited:    PicassoMania, Le Grand Palais, Paris, 7 October 2015 - 29 February 2016



Title: *Untitled*

Artist: Wade Guyton

Date: 2006

Medium: Epson UltraChrome inkjet on linen

Dimensions: 226.1 x 137.2 cms

Insured value: US$6,000,000


Provenance:   Petzel Gallery, New York; Private Collection, Belgium

              Inigo Philbrick Limited

Exhibited:    23 February – 25 March 2006, *Color, Power & Style*, Petzel Gallery, New York;

              4 October 2012 – 13 January 2013, Whitney Museum of American Art, New York



Title: *Untitled (P604)*

Artist: Christopher Wool

Date: 2009

Medium: Enamel on linen

Dimensions: 304.8 x 243.84 cms

Insured value: US$9,000,000


Provenance:   Max Hetzler Gallery

        Private Collection, Switzerland

        Private Collection, London

        Inigo Philbrick Limited

## Schedule 2

## Pro Forma Invoice

[Inigo Philbrick Limited letterhead]

[x] June 2017

Invoice No. [x]

 Guzzini Properties Limited

197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands

### PRO FORMA INVOICE

**Rudolf Stingel**

*Untitled,* 2012 (Picasso portrait)

Oil on canvas

241.3 x 193 cms


**Wade Guyton**

*Untitled,* 2006

Epson UltraChrome inkjet on linen

226.1 x 137.2 cms


**Christopher Wool**

*Untitled (P604),* 2009

Enamel on linen

304.8 x 243.84 cms


**TOTAL:**                                                    **US$6,000,000.00**

To be paid in full no later than [date].

Title passes on payment in full being made. This invoice is governed by English law.

**Schedule 3**

**Letter to Zurich Storage Facility**

[Inigo Philbrick Limited letterhead]

[Date]

The Directors
Möbel Transport AG
Gaswerkareal
Zurich CH 8010
Switzerland

Dear Sirs

RE: *Untitled*, 2012 (Picasso portrait) by Rudolf Stingel; *Untitled*, 2006 by Wade Guyton; and *Untitled (P604)*, 2009 by Christopher Wool (the "**Artworks**")

We write on behalf of Guzzini Properties Limited in relation to the above named Artworks, identified by tracking numbers 53195, 13107 and [x] respectively and located at Im Hackacker 4, 8902 Urdorf, stored by us at your premises on 31 January 2017, 29 April 2014 and [x] respectively.

You are instructed to hold the Artworks for the benefit of Guzzini Properties Limited to which legal and beneficial title in the Paintings has been transferred. The Paintings will remain in our storage facility at our expense but may only be moved or removed from storage with the sole express written approval of Guzzini Properties Limited.

Please sign and return a copy of this letter to acknowledge the above instructions.

For your information, the contact information for Guzzini Properties Limited is as follows:

Mr Alexander Bushaev
197 Main Street, PO Box 3174, Road Town, Tortola, British Virgin Islands
E-mail: abushaev@reubros.com

Yours faithfully,


Inigo Philbrick

For and on behalf of Inigo Philbrick Limited

_____

Read, agreed and accepted by


-------------------------------------------------
[name], Director                                    Date

For and on behalf of Möbel Transport AG.

**Schedule 4**

**Letter to Zurich Storage Facility**

[Guzzini Properties Limited letterhead]

[Date]

The Directors
Möbel Transport AG
Gaswerkareal
Zurich CH 8010
Switzerland

Dear Sirs

RE: *Untitled*, 2012 (Picasso portrait) by Rudolf Stingel; *Untitled*, 2006 by Wade Guyton; and *Untitled (P604)*, 2009 by Christopher Wool (the "**Artworks**")

We write on behalf of Inigo Philbrick Limited in relation to the above named Artworks, identified by tracking numbers 53195, 13107 and [x] respectively and located at Im Hackacker 4, 8902 Urdorf, stored by Inigo Philbrick Limited at your premises on 31 January 2017, 29 April 2014  and [x] respectively.

You are instructed to hold the Artworks for the benefit of Inigo Philbrick Limited to which legal and beneficial title in the Paintings has been transferred. The Paintings may only be moved or removed from storage with the sole express written approval of Inigo Philbrick Limited.

Please sign and return a copy of this letter to acknowledge the above instructions.

Yours faithfully,


Alexander Bushaev

For and on behalf of Guzzini Properties Limited


Read, agreed and accepted by


-------------------------------------------------
[name], Director                                    Date

For and on behalf of Möbel Transport AG.

# EXHIBIT 5

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM    INDEX NO. 651300/2020
NYSCEF DOC. NO. Case 1:20-cv-01797-KPF    Document 1-1    Filed 02/28/20    Page 100 of 127    RECEIVED NYSCEF: 02/28/2020

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 3
 2   ---------------------------------------------X
     GUZZINI PROPERTIES LTD.,
 3
                           Plaintiffs,
 4                                        Index No.
              -against-                   656467/19
 5
     "UNTITLED BY RUDOLF STINGEL, 2012,"
 6   in Rem,
 7                         Defendant.
     ---------------------------------------------X
 8                                   60 Centre Street
     Motion                          New York, New York
 9                                   February 19, 2020

10   B E F O R E:

11           HONORABLE  JOEL M. COHEN,

12                      JUSTICE

13   A P P E A R A N C E S :

14           MAZZOLA LINDSTROM, LLP
             ATTORNEYS FOR THE PLAINTIFF
15                   1350 AVENUE OF THE AMERICAS
                     NEW YORK, NEW YORK 10019
16           BY:     RICHARD E. LERNER, ESQ.,
                     WENDY J. LINDSTROM, ESQ.,
17                   NINA EDELMAN, ESQ.,

18           GROSSMAN, LLP
             ATTORNEYS FOR NON-PARTY VA COLLECTION
19                   745 FIFTH AVENUE
                     NEW YORK, NEW YORK 10151
20           BY:     JUDD B. GROSSMANN, ESQ.,

21           KELNER HERLIHY GETTY & FRIEDMAN, LLP
             ATTORNEYS FOR NON-PARTY FAP
22                   470 PARK AVENUE
                     NEW YORK, NEW YORK  10016
23           BY:     DOUGLAS A. KELLNER, ESQ.,

24
                     VINCENT J. PALOMBO, RMR, CRR
25                   OFFICIAL COURT REPORTER
```

PROCEEDINGS

1          THE COURT:  Everybody, welcome.  Counsel, can you

2     state your appearances, please, starting from the left.

3               MS.LINDSTROM:   Wendy Lindstrom for Guzzini.

4               MS. EDELMAN:  And Nina Edelman for Guzzini, also.

5               MR. LERNER:  Richard Lerner for Guzzini.

6               MR. GROSSMAN:  Good afternoon, your Honor.  Judd

7     Grossman, we're here today on behalf of the moving party,

8     nonparty V&A Collection, LLC, in the underlying litigation;

9     we also represent now intervenor plaintiffs, SAT Finance.

10              MR. KELLNER:  And my name is Douglas Kellner, I

11    represent FAP, which is a German company which also has a

12    claim on the painting.

13              We have a stipulation we are circulating to provide

14    for my intervention, but it hasn't been signed yet.

15              THE COURT:  Couple of things.  First of all, we

16    already have a restraining order in place to keep the

17    property -- I don't know whether you all have seen it -- you

18    probably have, the stipulation and order dated -- or signed

19    by me January 13th of this year, which Mr. Grossman signed

20    on behalf of his other named parties, or clients, and

21    Mr. Lerner signed, already provides that pending the final

22    determination of the issues of ownership, the -- at least

23    one piece of it shall remain and not be removed from

24    Christies and shall not be transferred, sold, pledged,

25    assigned or otherwise disposed of until further order of the

PROCEEDINGS

1    court.

2         Mr. Grossman, what are you seeking now that would

3    be different from that?

4         MR. GROSSMAN:  The short answer, your Honor, is

5    this application involves a different artwork.  So the

6    plaintiff filed the underlying proceedings in Rem to acquire

7    title to artwork by Rudolf Stingel.  That artwork is subject

8    to competing claims, including by SAT Finance -- I'll use

9    that term collectively -- as well as FAP, who has yet to

10   intervene in the action.

11        We put in, on behalf of SAT Finance, papers in

12   response to that application, but did not impose the

13   injunction sought there.

14        Plaintiff, for its part, claims to have acquired

15   that work under a June 2017 agreement.

16        THE COURT:  That work being --

17        MR. GROSSMAN:  The Stingel; correct.

18        For present purposes, I think we can move to the

19   side what we believe the import of that agreement was, but

20   in any case, under that very same agreement, plaintiff

21   purports to have also acquired a second work, a work by the

22   artist Wade Guyton.  That work is also subject to competing

23   claims and in this case the competing claimant is V&A

24   collection.  V&A seeks to intervene in this action which

25   necessarily involves a resolution of the rights and

PROCEEDINGS

1  obligations, respectively, under that June 2017 agreement.

2      THE COURT:  This action is an in Rem action about a

3  single painting?

4      MR. GROSSMAN:  Correct.

5      THE COURT:  So in what way does intervening in that

6  action, with respect to the different property, make sense?

7      MR. GROSSMAN:  Because --

8      THE COURT:  Isn't it a new action that you're

9  talking about?

10     MR. GROSSMAN:  We certainly could file a new

11 action,, plaintiffs consented to this Court's jurisdiction

12 for the purposes of deciding issues under this single

13 agreement under which they claim to have acquired ownership

14 of three works, the Stingel and the Guyton, among them.

15     The reason V&A Collection seeks to intervene in

16 this action rather than file a separate action in this court

17 is because plaintiff's alleged ownership rights derive from

18 an agreement that we claim did not transfer title to them.

19 We argue that it was an art-backed loan.  They paid

20 $6 million in exchange for which they received, as

21 collateral, free artworks which according to their agreement

22 ascribes an insurance value of $25 million, and therefore

23 any determination by this Court in the in Rem proceeding

24 concerning the meaning and the import of that contract will

25 necessarily impact V&A Collection's rights with regard to

PROCEEDINGS

1     the second property that was pledged as collateral.

2          THE COURT:  Look, I understand the basic umbrella

3     of issues we're talking about here, and I haven't seen yet,

4     anyway, somebody who had, anyway, any particular objection

5     to having these things be adjudicated, but I think that if

6     your plan is to bring claims with respect to a different

7     piece of property, then we need to all step back and figure

8     out what this case should look like.

9          So, I guess, let me ask Mr. Lerner, as the

10    architect and author of this adventure, you obviously know

11    Mr. Friedman and how do you propose to deal with all of

12    this?

13          MR. LERNER:  First let me address jurisdictional

14    issues, and there are quite a few.

15          First of all, my client is -- no longer owns the

16    work and it's not in New York.  So this Court has no

17    jurisdiction over the Guyton that he is seeking this Court

18    to exercise jurisdiction with respect to.

19          There is no jurisdictional basis for a plenary

20    action he might bring against my client and he's trying to

21    circumvent that by intervening.

22          This Court can't grant a TRO because the plaintiff

23    can't demonstrate a likelihood of success on the merits --

24          THE COURT:  Well, before you get to that, the

25    property isn't here to restrain it.

PROCEEDINGS

1          MR. LERNER:  Right, the property is not here.

2   There is no sworn statement in any of the plaintiff's papers

3   identifying the Guyton as being present in New York, and

4   although Mr. Grossman states in a proposed complaint that

5   Guzzini owns the Guyton, in fact, Guzzini does not own the

6   Guyton.

7          THE COURT:  The presence of it being in New York is

8   relevant if it's an in Rem action.

9          The thing, I guess, Mr. Grossman, that's confusing

10   me is that if you're intervening in an in Rem action about

11   another painting, sounds like whatever it is you are seeking

12   to assert, is not an in Rem action --

13          MR. GROSSMAN:  For sure.  It's not.  It's an

14   injunction over Guzzini.  We're just learning in connection

15   with this application, they're claiming not to own it, I'm

16   not hearing Guzzini sold it, and I think that would be an

17   area ripe for discovery about the transfer.

18          What I'm told is that on November 1st the day this

19   action was filed by Guzzini is the same day that this

20   purported transfer took place.  So I think there may be

21   issues relating to why it's no longer in possession.

22          Putting that aside, the injunction is against

23   Guzzini.

24          They styled it as an in Rem action, but since that

25   time the stipulation that the Court so ordered and the

VP

PROCEEDINGS

1    proposed stipulation that my friend seeks to put forward

2    allowing FAP to intervene brings us back to -- I'll call it

3    real person dispute where the defendant won't be the

4    property, the defendants will be the respective parties

5    here, and the Court, of course, has jurisdiction over

6    Guzzini who has come into this court.

7             THE COURT:  The problem I see here is that you are

8    here seeking relief with no complaint.

9             MR. GROSSMAN:  We have a proposed complaint.

10            THE COURT:  Right, but what is in front of me now,

11   I think, is a motion to intervene and a temporary

12   restraining order.  If you want to file a complaint like you

13   did with SAT Finance, and then seek to have them combined in

14   some way or coordinated, I get that.

15            MR. GROSSMAN:  I'm not wedded, your Honor, to the

16   procedure.  We, quite frankly, thought that streamlined

17   everything.

18            THE COURT:  I don't see how you can intervene in an

19   in Rem action with a totally different claim about a totally

20   different piece of art that's not an in Rem action.

21            MR. GROSSMAN:  Because it's the identical issues

22   under the agreement.  There's one agreement, not three.

23   There's one agreement under which Guzzini claims to have

24   acquired title.

25            This Court's ruling in the in Rem proceeding as to

PROCEEDINGS

1    whether they acquired title will necessarily impact our

2    client's rights regarding the other work that was included

3    among the three works in that agreement.  There could be --

4    if that other case, for example, isn't in front of your

5    Honor, we obviously could have the possibility of --

6         THE COURT:  Yes, look, my brain may not be creative

7    enough to figure out the right why to do it, but I'm quite

8    sure that you all can.  Obviously, Mr. Lerner, they can

9    bring their own case --

10        MR. LERNER:  Obviously, and seek to consolidate it.

11        THE COURT:  -- and then you have an odd situation,

12   some in Rem, some in personam, and I get the point, I think,

13   that if there is a case in which some legal determination

14   might be made with respect to the agreement, although I

15   don't know enough about the cases yet to know whether that's

16   true or not, I get the point that Mr. Friedman's new client

17   has some interest in being involved in that in some way,

18   whether it is a coordinated action or they get to be part of

19   the same deposition to -- at some point you can envision

20   this being a single action with respect to all of the

21   paintings.  I do not see a basis for me right now,

22   Mr. Friedman, to issue --

23        MR. GROSSMAN:  Grossman.

24        THE COURT:  Oh, I'm sorry.  How did I get that

25   wrong.  I just had a different firm in front of me which is

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM    INDEX NO. 651300/2020
NYSCEF DOC. NO.    Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 108 of 127 NYSCEF: 02/28/2020

9

PROCEEDINGS

1    where that came from.  Sorry.

2         What would be the basis for me enjoining somebody

3    you haven't sued yet with respect to a piece of art that's

4    not here?

5         MR. GROSSMAN:  Sure.  Well, again, as far as the

6    second part of that, we're not seeking an injunction under

7    7109, restraining the chattel, the property.

8         We're seeking an injunction against Guzzini who

9    claims to have purchased this artwork.

10         Now, if we're hearing that Guzzini transferred that

11    artwork on November one on the same day that it commenced

12    the underlying proceedings, the injunction could still issue

13    against Guzzini.  If they don't own it, I don't know what

14    the problem is with the injunction against them, but

15    especially under those circumstances where the timing of

16    that purported transfer was the same day that they were

17    coming into court to enforce rights under the agreement that

18    we're challenging, I think the TRO would be appropriate, at

19    the very least, to take expedited discovery to learn where

20    the work is and under what circumstances they purportedly

21    transferred it.  There is no prejudice to them, especially

22    if they're claiming not to own the work for this temporary

23    injunction to remain in place.  If that work is in a third

24    parties' hands and then with the possibility of it going

25    elsewhere, that work can never be recovered and that's the

PROCEEDINGS

1    very reason that you need property -- is suitable for the

2    type of short term injunction we seek.

3              THE COURT:  Let me just -- to set myself.  Again,

4    under the caption of the Stingel in Rem action, you are

5    asking me to enjoin them from transferring, selling,

6    pledging a different piece of art and also for leave to

7    intervene -- that's not temporary.  At the moment you do not

8    have a complaint?

9              MR. GROSSMAN:  We have the proposed complaint which

10   was filed on January 31st accompanying our application to

11   intervene.

12             THE COURT:  Is there -- again, I'm still trying to

13   follow all this.  With SAT Finance you filed a separate

14   complaint?

15             MR. GROSSMAN:  We did on consent.  We filed a

16   separate complaint.  Their answer is forthcoming.

17             MR. LERNER:  It's also an in Rem complaint that

18   they filed.

19             MR. GROSSMAN:  That's not correct.  We didn't file

20   an in Rem complaint.  We filed a complaint against Guzzini

21   seeking a declaratory judgement --

22             THE COURT:  Right.  But it's the same painting.

23             MR. GROSSMAN:  Exactly, the Stingel; correct.

24   Correct.

25             MR. LERNER:  It's to adjudicate the right --

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM          INDEX NO. 651300/2020
NYSCEF DOC. NO. Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 110 of 127CEF: 02/28/2020

11

PROCEEDINGS

1    declaration of the rights of the work.

2         MR. GROSSMAN:  For the Stingel.  Right.

3         THE COURT:  In at the moment, in the pending

4    action, there is nothing in it with respect to the Guyton

5    painting, you want to add that in to this action.

6         MR. GROSSMAN:  That's correct.  Your Honor,

7    procedurally we're not wedded to this idea, we just thought

8    it was the most efficient and straightforward way to

9    proceed.  Coordination works, as well.

10        THE COURT:  In order to get that kind of relief

11   what you would have to do is bring a claim and then show a

12   likelihood of success on the merits, and then some -- A.

13   Basis for jurisdiction for me to do what you want me to do,

14   and also an explanation of what the threat of imminent harm

15   is.  Sounds like you are really not -- at the moment you are

16   learning facts in realtime here about where this art is and

17   who owns it.

18        MR. GROSSMAN:  That's right.  And especially even

19   more so -- the threat of irreparable harm.  We thought it

20   was with them the entire time.

21        MR. LERNER:  I think we disclosed to him sometime

22   last week that we didn't own it.

23        MR. GROSSMAN:  That's right, last week for the

24   first time.

25        THE COURT:  But you're the one with the burden of

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
INDEX NO. 651300/2020
NYSCEF DOC. NO. 6
Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 111 of 127
RECEIVED NYSCEF: 02/28/2020

12

PROCEEDINGS

 1    showing me why I should enjoin Guzzini from something that

 2    they no longer own.  So how does that work?  If they're

 3    saying they don't own it --

 4          MR. GROSSMAN:  They're saying they don't own it,

 5    they're not saying they sold it and I think there's an

 6    important distinction.  I'm hearing a very coincidental

 7    timing of a transfer and in any case, in any case for us to

 8    satisfy that burden, we're happy to file a proposed amended

 9    complaint to later be coordinated, we would seek expedited

10    discovery to learn the whereabouts, among other things.

11          THE COURT:  Getting a TRO and then getting

12    discovery to figure out whether you're entitled to it

13    doesn't excite me.

14          MR. GROSSMAN:  I understand that, but it's only

15    because after -- or at the same time that Guzzini knew a

16    litigation was imminent that they transferred the work that

17    we're in this predicament.  We understood the work was with

18    them.  We understood like the Stingel, the work wouldn't be

19    moved pending a decision here, and that's one of the reasons

20    that this wasn't filed sooner, quite frankly.  And so

21    it's -- I'm sorry.

22          THE COURT:  Mr. Lerner, I'd like to at least get a

23    sense from where you stand on this.

24          MR. LERNER:  The failure to bring a plenary action

25    destroys the entire case.  There's no controversy before the

PROCEEDINGS

1    Court right now as between the parties.  There's no pleading

2    and without a pleading there's no controversy therefore

3    there's no basis for any injunctive relief to be granted.

4         Additionally, Mr. -- well, I should say V&A through

5    Mr. Grossman seek an order directed toward not just Guzzini,

6    but Guzzini's affiliates, which I don't know what that

7    actually means under English law, European law, British

8    Virgin Islands law, but I do know they're not before this

9    Court.  And this Court doesn't have jurisdiction over

10   entities that never set foot here.

11        The fact -- I don't know whether Mr. Grossman is

12   asserting general jurisdiction over Guzzini.  It sounds to

13   me that he's asserting some kind of long arm jurisdiction.

14   And there is no basis for such long arm jurisdiction because

15   there's no purposeful activity directed towards residents of

16   the State of New York by my client.

17        His beef, if you will, is with Inigo Philbrick,

18   LTD, who ripped him off, as he ripped off a lot of people

19   and.  In fact, Exhibit B to his motion -- I believe it was

20   in the proposed complaint identifies England as the site of

21   any litigation regarding the Guyton work in any dispute

22   between the seller, which was Inigo Philbrick, and the

23   purchaser, Andre Sakhai.

24        So the dispute should be in England, it should be

25   litigated there where, in fact, my understanding is there

PROCEEDINGS

1    are lawsuits against Inigo Philbrick presently proceeding in

2    England.  He could be sued there.  That's his place of

3    residence.  That's where the contract called for it to be

4    litigated, but in that there's a lack of purposeful activity

5    directed towards V&A in New York, there's no basis for long

6    arm jurisdiction either.

7              And finally, your Honor, you hit the nail on the

8    head, there's no equity jurisdiction here in that the Court

9    lacks the authority to direct -- to issue an order

10   restraining someone in the UK from doing anything.

11             THE COURT:  Well, I didn't quite say that.  If

12   there's personal -- if there had been -- or if there is

13   personal jurisdiction over Guzzini, who is the target of

14   this order to show cause, then I think there would be

15   jurisdiction to restrain a party in front of me if they had

16   been sued by this plaintiff, not to do something even if

17   that something was extra jurisdiction.

18             Now, what they're asking for is an order against

19   Guzzini not to dispose of this property, and I take it what

20   you're saying is you don't have the property to dispose of

21   to begin with --

22             MR. LERNER:  Correct.

23             THE COURT:  So you're saying that even if I signed

24   this, it would have no effect.

25             MR. LERNER:  Correct, and I don't think judges like

VP

PROCEEDINGS

1    to do empty gestures.

2         THE COURT:  Mr. Grossman, do you have any

3    information to the contrary?  It sounds like what you're

4    asking for -- now, you may have a complaint against someone,

5    it may be for damages, it may be trying to get an injunction

6    against the transfer of this property, wherever it is,

7    either under the law of that jurisdiction or against

8    somebody else, but it doesn't sound like -- I'm not sure I

9    have reasons to disagree with what Mr. Lerner said as a

10   factual matter -- you can go ahead and file your complaint.

11   I'm still not persuaded yet that it's really intervention

12   more than a separate complaint.  But it sounds like you

13   don't care about the difference -- I'm sorry, you are

14   indifferent as to how you do it.

15         But I -- so now that you've heard all of this and

16   unless have you some reason to disbelieve it, do you agree

17   that the relief you are seeking is ineffectual?

18         MR. GROSSMAN:  Not necessarily and I don't mean to

19   mince words, your Honor, but not physically being in

20   possession of something is very different than not having

21   control or the ability to control, and absent some -- some

22   proof that this work is outside of Guzzini's custody and

23   control, even if not physically in its possession, I think

24   there's no question this injunction can issue and it's

25   issued in cases just like this that we filed in this court

PROCEEDINGS

1    many times throughout the years.

2            As far as jurisdiction, again, the jurisdiction

3    isn't in Rem over the work, it's against Guzzini.  Guzzini

4    came here voluntarily, so I don't think there can be any

5    question --

6            THE COURT:  Look, the fact that some body sues in

7    action one doesn't mean they're necessarily subject to

8    jurisdiction in action two.

9            Let me just ask Mr. Lerner, are you in a position

10   to represent, just in responding to what Mr. Grossman just

11   said, that Guzzini is not in a position to transfer, sell,

12   pledge, assign or otherwise dispose of this painting?

13           MR. LERNER:  Yes.  It's out of its possession and

14   control.

15           THE COURT:  So in front of the flags and

16   everything --

17           MR. LERNER:  In God we Trust.  That is what I've

18   been advised.

19           MR. GROSSMAN:  Your Honor, one point to clarify the

20   record, Exhibit B that Mr. Lerner referenced is an invoice

21   for an entirely different Guyton work.  I wanted to clarify

22   that point and it's confusing because all of these Guyton

23   works seemed to be named untitled in a different -- and

24   approximately same dimensions, but there's different -- any

25   case, any choice of law provision there was between Modern

PROCEEDINGS

1    Collections and V&A, not Guzzini, just wanted --

2         MR. LERNER:  If I was confusing, I apologize, but

3    it was annexed to his proposed complaint.  So that would be

4    the source of my confusion.

5         THE COURT:  I didn't understand either.

6         I think what needs to happen is at least -- I'm

7    comfortable that Mr. Lerner wouldn't mislead either me or

8    you, I think you need to file your complaint, I don't think

9    that unless you have -- I don't think it can be under the

10   same docket number because it is a different piece of

11   property, but I am willing to consider it a related action

12   and defer for now on whether they're consolidated for

13   discovery or more broadly.  I think it's too early to get

14   into.  But I think to save your place in line and seat at

15   the table and whatever other kind of metaphor one might use,

16   I think that's the best way to do it.

17        So I would -- I'm going to deny the request to

18   intervene in this action, recognizing that you are

19   presumably probably going to file and then do what you can

20   to serve an attached jurisdiction to whatever defendant you

21   are going to sue, but that's separate and apart from

22   everything else.

23        I think that's really all I can do.  I don't think

24   there's a need to set a hearing on the motion to intervene.

25        MR. GROSSMAN:  Your Honor -- and that all makes a

PROCEEDINGS

 1    lot of sense, and of course, the pleading that we filed

 2    based on Mr. Lerner's representation which, of course, we

 3    accept, now would be conversion, not a replevin action

 4    against Guzzini.  At the same time, of course, in light of

 5    the urgency of finding out where this artwork is, we would

 6    be seeking expedited discovery.

 7              So to that extent, again, I don't have a

 8    preference, but we would like to get that back in front of

 9    your Honor on an expedited basis.

10              THE COURT:  Yes, look, I get that.  I think that if

11    you want to do it informally rather than spending the money

12    with motions and everything else, that's fine, as long as

13    it's very narrowly tailored to just figuring out where this

14    is and who owns it and then you will have to decide what

15    actions to take to preserve the property, wherever it may

16    be.

17              MR. GROSSMAN:  Sure.

18              THE COURT:  That's fine.  I don't know, Mr. Lerner,

19    given that we're going to be living together, I don't know

20    if it makes sense to provide -- if it is a very narrow list

21    of things --

22              MR. LERNER:  I know that you have experience,

23    perhaps, litigating in Europe and elsewhere and you know

24    that they may put up a fuss about documents being

25    transmitted out of the jurisdiction, and so I can't speak to

VP

PROCEEDINGS

1    that at the moment.

2              THE COURT:  I get that.  To the extent that --

3    where is Guzzini located?

4              MR. LERNER:  Guzzini is a British Virgin Islands

5    company and -- so that -- it's principal place of business,

6    I believe to be London -- London.

7              THE COURT:  So the documents or whatever data is

8    going to be in the UK?

9              MR. LERNER:  Likely.

10             THE COURT:  I guess, Mr. Grossman, you have a

11   couple of options.  You can seek expedited discovery here or

12   can you institute whatever proceedings you need to, once you

13   find out where the painting is, wherever that is.  I have

14   limited ability to intercede over there.

15             MR. LERNER:  It's my understanding that

16   Mr. Grossman's clients have pending litigation in the UK

17   already.  So I think --

18             THE COURT:  When do I get a visit from somebody

19   with respect to the third painting?

20             MR. LERNER:  The third?  -- oh --

21             MR. GROSSMAN:  I don't think you will.

22             THE COURT:  Is that right.

23             MR. GROSSMAN:  I think that's right.

24             MR. LERNER:  If we're concluded with this part of

25   the matter, we do have a preliminary conference scheduled

PROCEEDINGS

1    for February 25th, and Mr. Kellner is here representing FAP

2    who will be intervening and seeking to stake his claim to

3    the Stingel and we've agreed to a stip --

4              Did you sign it yet?

5              MR. GROSSMAN:  I haven't --

6              MR. LERNER:  -- that would allow his client to

7    intervene, file a complaint by Monday and we would have time

8    to answer and we do have -- we leave a blank on the proposed

9    stip as to when the compliance conference should be

10   adjourned to because, February 25th no longer makes sense.

11             THE COURT:  Yes, I agree.

12             Sounds like, Mr. Kellner, your motion is going to

13   be not contested.

14             MR. KELLNER:  Well, we're just going to stip, so I

15   can file an answer.

16             MR. LERNER:  A complaint.

17             THE COURT:  That's fine.

18             We should fill out the date and I think -- assuming

19   Mr. Grossman gets his complaint on file and things get

20   served, we should go under the assumption that hearings on

21   these cases, for now, they should be synchronized, so that

22   whatever decisions we make about schedule are, at least,

23   done at the same time.  Remains to be seen whether they can

24   be linked together in a more substantive way, but for now I

25   see a connection how that makes sense.

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM
INDEX NO. 651300/2020
NYSCEF DOC. NO. Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 120 of 127 CEF: 02/28/2020

21

PROCEEDINGS

1        So should we go ahead and pick a different day for

2   that?

3        MR. LERNER:  Would that be the day that

4   Mr. Grossman makes his order to show cause returnable?

5        THE COURT:  I don't plan to sign the order to show

6   cause.

7        MR. LERNER:  I know, he will bring on a new

8   action -- he's bringing on a new action, presumably he'll

9   want to bring on a new order to show cause to consolidate it

10  quickly.

11       THE COURT:  You mean an order to show cause to

12  consolidate the actions?

13       MR. LERNER:  Yes.

14       THE COURT:  First, I would see if you're all going

15  to agree to it.  If you don't agree to it, then that's fine.

16  We can then -- I don't know that you necessarily need to

17  consolidate them right now.  As long as they're related

18  actions and they all come to me, we can keep them separate

19  until we need to consolidate.

20       MR. GROSSMAN:  On behalf of SAT Financing and V&A

21  Collection, coordination makes sense to us.  We don't seek

22  consolidation or merger --

23       THE COURT:  Not yet.

24       MR. GROSSMAN:  Yes.

25       THE COURT:  Why don't we -- let's make sure we get

FILED: NEW YORK COUNTY CLERK 02/28/2020 09:31 AM    INDEX NO. 651300/2020
NYSCEF DOC. NO.    Case 1:20-cv-01797-KPF   Document 1-1   Filed 02/28/20   Page 121 of 127   NYSCEF: 02/28/2020

22

PROCEEDINGS

1    past the point of the new action being served and just --

2    we're not going to get -- have different answers in the main

3    case.

4         MR. GROSSMAN:  SAT Finance has answered Guzzini's

5    complaint and filed its own complaint, but I believe --

6         MR. LERNER:  We have an answer to his complaint and

7    I assume that Mr. Kellner will be filing -- if your Honor

8    signs a stip, he'll be filing his complaint on behalf of FAP

9    on Monday and according to the stip, allow 30 days to

10   answer.

11        THE COURT:  From my perspective, I'm okay waiting

12   for the dust to settle on all of this.  I will find ways to

13   occupy myself in the meantime.  So I'm okay to hold off on a

14   preliminary conference until all the cases are, sort of,

15   where they need to be in terms of ready for issue to be

16   joined and the like.

17        Subject to it, if people want to get started on

18   discovery, as Mr. Grossman is saying, some expedited

19   discovery, which does presuppose getting jurisdiction.  I

20   don't want to stop that from happening so you can make

21   application once you file your complaint.  I'm not going to

22   call a broad preliminary conference, but if you want

23   expedited discovery or anything else, you can bring that on

24   by order to show cause, if you can't work it out.

25        MR. LERNER:  I trust the Court understands that

PROCEEDINGS

1    we'll be moving to dismiss on jurisdictional grounds.  So

2    that's going to slow that case down.

3              THE COURT:  Yes, which is -- you know, I guess

4    Mr. Grossman, sounds like you're going to be chasing this in

5    different places, where the property is --

6              MR. GROSSMAN:  Where the property is.  The

7    conversion claim will go forward here against Guzzini and

8    we'll argue personal jurisdiction.

9              THE COURT:  In terms of the discovery --

10             MR. GROSSMAN:  Yes.

11             THE COURT:  -- you have to get jurisdiction first.

12             MR. GROSSMAN:  Of course.

13             THE COURT:  All right, fabulous.  This sounds like

14   it's going to be interesting.  Why don't you all just make

15   an application for a preliminary conference once everybody

16   agrees that we are good to go.  If, for some reason,

17   something is delaying something and the rest of you want a

18   preliminary conference, that's fine.

19             If you have any problems getting it as a related

20   action and it doesn't come to me, let me know that, as well.

21             MR. GROSSMAN:  Okay.

22             MR. LERNER:  Can we just have a minute amongst

23   attorneys?

24             THE COURT:  Yes.

25             (Discussion held off the record.)

24

PROCEEDINGS

1          THE COURT:  Off the record we've had various

2    conversations about how to proceed.

3          Counsel are going to talk about some of the

4    delicate procedural issues here and I've indicated that to

5    the extent that Mr. Grossman is going to file a new

6    complaint, it should be designated as a related action so

7    that it comes before me.

8          We will discuss various ways in which we may have

9    to coordinate, potentially consolidate, but let's first have

10   the cases related, they will all be in front of me and we'll

11   defer having a preliminary conference until the new actions

12   are ripe for that, and when that happens, the parties are

13   going to file a request for preliminary conference and we'll

14   set that up.

15          MR. GROSSMAN:  Thank you, your Honor.

16          MR. KELLNER:  Thank you.

17          MR. LERNER:  Thank you.

18               *          *          *

19               CERTIFIED THE FOREGOING IS

20               A TRUE AND ACCURATE TRANSCRIPTION

21               OF THE PROCEEDINGS, THIS DATE.

22

23          _____

24               VINCENT J. PALOMBO, RMR

25

# EXHIBIT 6

| From: | Lindsay E. Hogan |
|---|---|
| To: | Judd Grossman; Richard Lerner |
| Cc: | Wendy Lindstrom; Sarah Schuster |
| Subject: | RE: V&A Collection, LLC v. Guzzini Properties Ltd., Summons and Verified Complaint and Notice of Order to Show Cause |
| Date: | Thursday, February 27, 2020 9:48:00 AM |

Richard,

We agree to adjourn our application until tomorrow morning. We plan to file first thing and we will let you know once we have further information from the Court about when the application will be heard.

Regards,
Lindsay

Lindsay E. Hogan, Esq.
**GROSSMAN LLP**
745 Fifth Avenue - 5th Floor
New York, New York  10151
(t) (646) 770-7445
(f) (646) 417-7997
www.grossmanllp.com

*This message and any attached documents contain information that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender upon receipt by reply e-mail and then delete this message.*

---

**From:** Judd Grossman
**Sent:** Wednesday, February 26, 2020 8:44 PM
**To:** Richard Lerner
**Cc:** Wendy Lindstrom; Lindsay E. Hogan; Sarah Schuster
**Subject:** Re: V&A Collection, LLC v. Guzzini Properties Ltd., Summons and Verified Complaint and Notice of Order to Show Cause

Richard,

Based on your representations to the Court last week, you knew this motion was coming. The notice is more than sufficient. Whether you attend is up to you.

Judd B. Grossman
GROSSMAN LLP
(O) 646.770.7445
(C) 917.617.4526

On Feb 26, 2020, at 8:39 PM, Richard Lerner <Richard@mazzolalindstrom.com> wrote:

You've misinterpreted my email. I wasn't acknowledging that I would appear for an OTSC tomorrow. You've got to get jurisdiction first.

We can chat tomorrow late afternoon. You can't send an email at 7pm and expect us to drop everything and show up in court with less than 24 hours notice

Get Outlook for Android

---

**From:** Judd Grossman <jgrossman@grossmanllp.com>
**Sent:** Wednesday, February 26, 2020 8:33:29 PM
**To:** Richard Lerner <Richard@mazzolalindstrom.com>
**Cc:** Wendy Lindstrom <wendy@mazzolalindstrom.com>; Lindsay E. Hogan <lhogan@grossmanllp.com>; Sarah Schuster <sschuster@grossmanllp.com>
**Subject:** Re: V&A Collection, LLC v. Guzzini Properties Ltd., Summons and Verified Complaint and Notice of Order to Show Cause

Ok, see you tomorrow.

Judd B. Grossman
GROSSMAN LLP
(O) 646.770.7445
(C) 917.617.4526

On Feb 26, 2020, at 8:31 PM, Richard Lerner <Richard@mazzolalindstrom.com> wrote:

> We are not authorized to accept service of the new action, nor the order to show cause.
>
> Get Outlook for Android
>
> ---
>
> **From:** Lindsay E. Hogan <lhogan@grossmanllp.com>
> **Sent:** Wednesday, February 26, 2020 7:00:23 PM
> **To:** Wendy Lindstrom <wendy@mazzolalindstrom.com>; Richard Lerner <Richard@mazzolalindstrom.com>
> **Cc:** Judd Grossman <jgrossman@grossmanllp.com>; Sarah Schuster <sschuster@grossmanllp.com>
> **Subject:** V&A Collection, LLC v. Guzzini Properties Ltd., Summons and Verified Complaint and Notice of Order to Show Cause
>
> Dear Wendy and Richard,
>
> We write on behalf of V&A Collection, LLC to attach a copy of the Summons and Verified Complaint filed in the above-

referenced case this evening (an Index Number has not yet been assigned) and to notify you that we intend to file an order to show cause in the above-referenced case tomorrow afternoon, February 27, 2020, requesting expedited discovery concerning Guzzini's possession of a painting by Wade Guyton, "Flaming U," 2015, and the purported transfer of the painting outside of Guzzini's "possession and control" as represented to Justice Cohen on February 19, 2020, as well as jurisdictional discovery. We will circulate copies of the papers by email once they have been electronically filed, and we will notify you once we are advised when the application will be heard.

Also, please let us know if you will accept service of the attached on behalf of Guzzini Properties Ltd.—of course without waiving any jurisdictional objections. We will notify you once an Index Number has been assigned.

Please call or email us in the meantime if there is anything you would like to discuss.

Very truly yours,
Lindsay

Lindsay E. Hogan, Esq.
**GROSSMAN LLP**
745 Fifth Avenue - 5th Floor
New York, New York  10151
(t) (646) 770-7445
(f) (646) 417-7997
www.grossmanllp.com

*This message and any attached documents contain information that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender upon receipt by reply e-mail and then delete this message.*