K36KVAAM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

V&A COLLECTION, LLC,

                    Plaintiff,

          v.                            20 CV 1797 (KPF)

GUZZINI PROPERTIES LTD.,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        March 6, 2020
                                        1:44 p.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                        District Judge

                       APPEARANCES

GROSSMAN LLP
     Attorneys for Plaintiff
BY:  JUDD B. GROSSMAN
     LINDSAY E. HOGAN

MAZZOLA LINDSTROM LLP
     Attorneys for Defendant
BY:  RICHARD E. LERNER
     WENDY J. LINDSTROM

K36KVAAM

1              (Case called)

2              MR. GROSSMAN:  Good afternoon, your Honor.  Judd

3     Grossman, on behalf of plaintiff, V&A Collection.

4              THE COURT:  Thank you very much.  And with you at

5     counsel table?

6              MS. HOGAN:  Good afternoon, your Honor.  Lindsay

7     Hogan, from Grossman LLP, on behalf of plaintiff.

8              THE COURT:  Thank you very much.

9              To which of you should I be directing my questions

10    this afternoon?

11             MR. GROSSMAN:  To me, your Honor.

12             THE COURT:  Thank you, Mr. Grossman.

13             And at the back table.

14             MS. LINDSTROM:  Hi, your Honor.  My name is Wendy

15    Lindstrom.  I'm with Mazzola Lindstrom, and we represent

16    Guzzini.

17             THE COURT:  Thank you very much.

18             MR. LERNER:  I'm Richard Lerner.  I'm also with

19    Ms. Lindstrom, appearing for Guzzini.

20             THE COURT:  Okay.  Thank you.

21             I think we have another law firm listed in ECF for

22    you, but that's because people move and ECF doesn't update.

23             Welcome to everyone this afternoon.  Thank you very

24    much for appearing.

25             Let me ask -- Ms. Lindstrom, am I directing to you?

K36KVAAM

1          MS. LINDSTROM:  Yes, your Honor.

2          THE COURT:  Ms. Lindstrom, have you received the

3     materials regarding a motion in this court, as distinguished

4     from state court, for service by alternate means and by

5     expedited discovery?

6          MS. LINDSTROM:  Yes, your Honor, I have.

7          THE COURT:  I'll ask your thoughts on it a little bit

8     later.

9          Mr. Grossman and Ms. Hogan, just because this is our

10    first meeting together, I'd like you to know that in each of

11    the matters or papers that you submitted to me, you have my

12    name presented incorrectly, so just going forward, get the name

13    right, and if you look on the website, you'll see how I

14    presented it.

15          MR. GROSSMAN:  Apologies.

16          THE COURT:  No, it's fine.  We begin the process

17    knowing it.

18          But let me, actually, since you did not remove the

19    case, and the folks at the back table did, my questions begin

20    with them.  So, excuse me.

21          Ms. Lindstrom, tell me, please, the status of the

22    action before Judge Cohen regarding the Stigler painting.

23          MS. LINDSTROM:  Your Honor, we filed on behalf of

24    Guzzini, as a plaintiff, a case in the state court because we

25    are naming a painting, a Stengel painting, in rem.

K36KVAAM

1          THE COURT:  Yes, I saw that.  And I've read -- your

2     adversary included a transcript of a conference before Judge

3     Cohen taking place on or about February 19th of 2020.  I have

4     read it.

5          MS. LINDSTROM:  Yes.

6          Okay.  So, your Honor, this case involves a completely

7     different painting, and it involves completely different

8     claimants.

9          THE COURT:  Ms. Lindstrom --

10          MS. LINDSTROM:  No one is in common.

11          THE COURT:  Ms. Lindstrom, I'm just asking a question,

12     and please don't answer the question that I haven't asked.  My

13     question is:  What is the status of the state court action?  Is

14     it going on right now, today?

15          MS. LINDSTROM:  Yes, absolutely, your Honor.

16          THE COURT:  Thank you.

17          Who are the parties in that action?

18          MS. LINDSTROM:  Guzzini is the plaintiff, and it is an

19     in rem action against a painting, a Stengel painting.

20          THE COURT:  Yes.

21          MS. LINDSTROM:  There are also additional claimants

22     that have filed as intervening plaintiffs, one of which, I

23     believe, is SAT Finance, which is a company that is affiliated

24     with Sasha Pesko, and another company called FAP, and that

25     company is a lender that is also stating claim to that work of

K36KVAAM

1    art, that Stengel.

2           THE COURT:  Yes.  My understanding from the transcript

3    that I read was that V&A attempted to intervene, but was denied

4    intervention precisely because it was respecting a different

5    painting; am I correct?

6           MS. LINDSTROM:  Absolutely, your Honor, you're

7    correct.

8           THE COURT:  Okay.

9           What was confusing to me is that later on in the

10   proceedings, the suggestion, that I'm not sure from whom it

11   emanates, is to file another action, and Judge Cohen was going

12   to consider them in tandem.  Did I not read that correctly?

13          MS. LINDSTROM:  Your Honor, you did read that

14   correctly.

15          THE COURT:  Okay.

16          MS. LINDSTROM:  There was discussion at that

17   conference that the plaintiff, V&A, a totally unrelated

18   plaintiff, would file an action in that court, and that would

19   be marked as a related action.

20          THE COURT:  Yes.

21          MS. LINDSTROM:  However, Guzzini is not a defendant in

22   that action, and Guzzini does not agree that that's a related

23   action in any way.

24          THE COURT:  But it's a little bit unfortunate.  Did

25   you tell Judge Cohen then that as he was articulating this plan

K36KVAAM

```
 1    to have the cases heard relatedly, that you were going to

 2    object and remove the case to federal court, so that he

 3    couldn't do that?  Because that seems -- I think you should

 4    have let him know then that you --

 5              MS. LINDSTROM:  Your Honor.

 6              THE COURT:  Let me finish.  Thank you.

 7              I think you should have let him know then that you

 8    were going to be putting up that roadblock, because they set up

 9    a conference, and then you removed the case.  You could have

10    let him know on February 20th that you believed these were so

11    unrelated, that they should not even be heard in tandem.

12              So I guess I'm a little confused as to when the

13    decision was made to remove.  Did you know, at the moment of

14    that conference, that you were going to remove?

15              MS. LINDSTROM:  Absolutely not, your Honor.  I made a

16    strategic decision on Monday, after I read the pleadings that

17    the V&A parties filed, and I thought about it long and hard,

18    and I thought it would be a smart, tactical decision to have a

19    fresh set of eyes in an unrelated court, in an unrelated

20    proceeding, review the V&A pleading.  I certainly had no

21    intention of misleading the Court, the New York Supreme Court,

22    but when I really gave it thought, one of our biggest arguments

23    is that there is no jurisdiction over our client in this

24    matter, and that there should be services under the Hague

25    Convention.
```

K36KVAAM

| | |
|---|---|
| 1 | THE COURT:  Again, again, you're getting ahead of |
| 2 | yourself.  I promise you, I know the questions to ask, and I |
| 3 | will ask them.  Please answer the questions that I am asking, |
| 4 | and not the ones you think I'm asking. |
| 5 | Go on. |
| 6 | MS. LINDSTROM:  I just made a tactical decision on the |
| 7 | Monday after he filed to remove. |
| 8 | THE COURT:  Okay.  One moment, please. |
| 9 | MS. LINDSTROM:  Oh, I apologize, your Honor.  It was |
| 10 | Friday. |
| 11 | THE COURT:  Okay.  Thank you. |
| 12 | Your view is -- well, you have several views.  You |
| 13 | believe there is no jurisdiction over your client? |
| 14 | MS. LINDSTROM:  That is correct, your Honor. |
| 15 | THE COURT:  Okay. |
| 16 | You believe, as well, that you can simultaneously |
| 17 | remove the case to federal court and disclaim any -- and |
| 18 | require service through the Hague Convention? |
| 19 | MS. LINDSTROM:  Yes, absolutely, your Honor. |
| 20 | THE COURT:  I see.  I might be disagreeing with you, |
| 21 | but we shall see. |
| 22 | Where is the painting? |
| 23 | MS. LINDSTROM:  Your Honor, it's in Europe. |
| 24 | THE COURT:  Where? |
| 25 | MS. LINDSTROM:  It's in Switzerland. |

K36KVAAM

1          THE COURT:  With whom?

2          MS. LINDSTROM:  It is with an affiliate.  It's

3     confidential proprietary information, but it's with an

4     affiliate of my client, the director of --

5          THE COURT:  Hold on, please.  Back up.  Europe, I

6     understand.  Switzerland, I understand.  Affiliate of your

7     client, I understand.

8          What do you mean it's confidential proprietary

9     information?  I thought you said -- and I will look again at

10    the proceeding.  I thought you said that it had been sold.  If

11    you'll give me a moment, please -- here.  Mr. Lerner says:  "My

12    client no longer owns the work, and it's not in New York."

13         Was there an asterisk there that should have been, "My

14    client doesn't, but an affiliate of my client continues to own

15    the work"?  Is that the point being made?  Because I'd like to

16    be sure I understand this.

17         MS. LINDSTROM:  Certainly your Honor.

18         My client transferred the work on November 1st to a

19    company where the director of my client is one of the directors

20    at the company that it was transferred to.

21         THE COURT:  Either under common conceptions or under

22    Swiss law, is it an affiliate of your client, Guzzini

23    Properties?

24         MS. LINDSTROM:  Your Honor, I'm not a Swiss attorney.

25    I can't opine on Swiss law.

K36KVAAM

1           THE COURT:  Fair enough.

2           What is the name of the company?

3           MS. LINDSTROM:  The name is Lanark.

4           THE COURT:  How is that spelled, please?

5           MS. LINDSTROM:  L-a-n-a-r-k.

6           THE COURT:  Okay.  Right now, today, I'm assuming --

7    Lanark is clearly not an individual, so, in my mind, which

8    could be completely incorrect, it's not on somebody's mantel

9    right now.  It's awaiting something.  It hasn't been sold, it

10   hasn't been otherwise resolved.  Or is it -- because I'm not so

11   wealthy to have paintings like this, is it something where

12   folks buy it in the name of a company, but they do hang it up

13   on their wall?

14          MS. LINDSTROM:  Your Honor, sometimes that's the case.

15   In this instance, however, it is in storage in Switzerland.  As

16   of November 1st, it has never been moved from storage in

17   Switzerland.

18          THE COURT:  Okay.

19          MS. LINDSTROM:  It's always been there.  No

20   emergencies have happened.  There's been no change in location,

21   aside from I think that it may have been moved from one storage

22   facility to the next storage facility or within the same

23   storage facility, but nothing material has happened since

24   November 1st.

25          THE COURT:  If you know, and you may not -- I'm sorry,

K36KVAAM

1    the name is Lanark?

2              MS. LINDSTROM:  L-a-n-a-r-k.

3              THE COURT:  That's right, you did spell that, yes.

4    Thank you.

5              Would you know if Lanark presently intends to, for

6    example, consign this painting for auction, sell it to someone?

7    I mean, can we trust that until I resolve these jurisdictional

8    issues, it's not going to get sent to someone else?  Or can I

9    not?

10             MS. LINDSTROM:  Yes, absolutely, your Honor.  I can

11   represent that they will not move that to anyone else in

12   Lanark, although I do not represent Lanark, but I have direct

13   communication with one of the directors there.

14             THE COURT:  I see.  And you can tell him that I asked

15   really nicely --

16             MS. LINDSTROM:  Yes.

17             THE COURT:  -- if they could refrain from moving it?

18             MS. LINDSTROM:  Yes, absolutely, your Honor.

19             THE COURT:  Okay.

20             And do I understand you a moment ago to have been

21   saying that on or about the 1st of November, it was transferred

22   from Guzzini Properties to Lanark?

23             MS. LINDSTROM:  Yes, absolutely.

24             THE COURT:  Okay.

25             When you say a transfer -- excuse me if this sounds

K36KVAAM

1    like an obtuse question -- do you mean that the physical

2    painting was carried from one room to another, or is it that

3    there was a document that recited that title had once reposed

4    with Guzzini and now reposes with someone else, or both, or

5    neither?

6            MS. LINDSTROM:  Your Honor, I, frankly, know that

7    there's documentation showing a transfer and, frankly, an

8    invoice.  That being said, I'm not sure if it went within

9    different storage accounts, I just don't have those details at

10   this time, but I know that it's in storage in Switzerland.

11           THE COURT:  Okay, okay.  Staying in storage, not going

12   anywhere at least for the moment.  Okay, great.  Thank you for

13   letting me know that.

14           This seems this case, and the case before Judge Cohen,

15   are, from judges' perspectives, quite interesting because

16   they're not like our bread and butter fare, but maybe all art

17   law cases are interesting in that regard.  In your other case,

18   in the in rem action, I believe that either in the conference

19   or in your complaint, you explained why your client's ownership

20   of the property supervened any other ownership.  I believe in

21   one case, the issue -- one of the reasons given was that the

22   other entity had contracted to purchase the painting, but

23   hadn't performed in full.  I'm sorry, I'm saying painting, I

24   really mean the Stengel.  Is that a photograph and not a

25   painting?

K36KVAAM

1          MS. LINDSTROM:  It's a painting, your Honor.

2          THE COURT:  Thank you so much.

3          And with respect to another putative entity, that they

4    were not the owner because they had participated in the

5    auction, and, therefore, by necessity, they could not be the

6    owner.

7          Are you able to comment on the claims of the plaintiff

8    in this case?  Is there some reason that you might believe that

9    what has been said to me in this complaint is incorrect?

10          MS. LINDSTROM:  Yes, absolutely, your Honor.  And this

11    is part of the reason why, on Friday, after Mr. Grossman filed

12    the action in New York Supreme, I wanted a fresh set of

13    judicial eyes, be it as it may, on this, because there is --

14    the contract that Mr. Grossman is calling a financing statement

15    and a loan is not a financing statement or a loan.  It clearly

16    states -- and Mr. Grossman marked it as an exhibit to his

17    complaint, so your Honor could look at it.

18          THE COURT:  Yes, I have it.

19          MS. LINDSTROM:  So, if you look at -- the contract

20    itself, not -- you have two different sets of paperwork in

21    front of you.  On August 28, there is an extension agreement of

22    the contract.  And then in June of 27, you have the actual

23    contract itself.  And if you look under A, it says, "The

24    sellers agree to sell the artwork, and buyer agrees to purchase

25    the artwork."  And then, if you go to the next page, paragraph

K36KVAAM

1  2, it talks about the sale and purchase on and subject to the

2  terms and conditions of this agreement --

3       THE COURT:  Please, please, I'll ask you, please, to

4  slow down for the court reporter and judge.  Thank you so much.

5       MS. LINDSTROM:  Sure.

6       -- and in consideration of the payment to the buyer of

7  the purchase price, the seller hereby sells to the buyer all

8  legal and beneficial ownership in the artwork, and the buyer

9  agrees to buy the artwork.

10      At paragraph 3.4 in that document, it says, "Legal and

11 beneficial title in the artwork shall transfer to the buyer

12 upon the buyer's payment of the purchase price to the seller."

13 And then it talks, in 4.1.1, how the seller has full legal and

14 beneficial title to the artwork and is entitled, without

15 further action, to transfer the legal and beneficial title in

16 the artwork to the buyer on the terms of the agreement without

17 the consent of any third party.

18      And then going to the next page, it does talk about a

19 seller's option to buy the artwork back.

20      THE COURT:  Yes.

21      MS. LINDSTROM:  And then it talks -- in 8.1, it talks

22 about how this is the whole agreement, and 8.7, it talks about

23 this contract as governed in accordance with English law, and

24 there is an English jurisdiction clause.

25      So, it's my view that this contract is governed by

K36KVAAM

|   |   |
|---|---|
| 1 | English law, and any claims arising from this contract should |
| 2 | be adjudicated in England. |
| 3 |          Now, taking this one step forward, the first page of |
| 4 | that document, dated August 28, 2018, is what the plaintiff's |
| 5 | attorney will likely argue with you creates a loan out of this, |
| 6 | which, in our view, this is an extension only of the buyback |
| 7 | clause.  And this is not an extension of the contract in whole, |
| 8 | but, obviously, I'll let the plaintiff -- |
| 9 |          THE COURT:  Yes, thank you. |
| 10 |          MS. LINDSTROM:  -- argue that. |
| 11 |          But going one step further, V&A is not a party to this |
| 12 | contract, and the plaintiff and his lawyer, knowing that V&A is |
| 13 | not a party to this contract, contacted my client, without me |
| 14 | knowing about it -- |
| 15 |          THE COURT:  Wait, I'm sorry, start that again, please. |
| 16 | Go ahead. |
| 17 |          MS. LINDSTROM:  The plaintiff -- |
| 18 |          THE COURT:  Yes, the plaintiff here. |
| 19 |          MS. LINDSTROM:  -- and possibly the plaintiff's lawyer |
| 20 | had his client, Victoria Brooks, contact my client directly, |
| 21 | schedule a meeting in London, flew to London, appeared at that |
| 22 | meeting with my client outside of my presence, and without |
| 23 | telling me about this -- |
| 24 |          THE COURT:  Okay, okay.  Again, slow down, please, for |
| 25 | the court reporter.  Thank you.  And the judge. |

K36KVAAM

1          MS. LINDSTROM:  -- in violation of Rule 4.2 of the

2     New York Rules of Professional Conduct, which says, very

3     clearly, that in representing a client, a lawyer shall not

4     communicate or cause another to communicate about the subject

5     of representation with a party the lawyer knows to be

6     represented by another lawyer in the matter unless the lawyer

7     has prior consent of the other lawyer.  And he never told me

8     that he was going to London, meeting with my client --

9          THE COURT:  Well, I'll talk to Mr. Grossman

10     momentarily about whether he was there, but, okay.  And?  And

11     did something happen at this meeting other than the fact that

12     this meeting happened?

13          MS. LINDSTROM:  No, but, your Honor, if he's so

14     willing to go to London with his client, why can't he litigate

15     this case in London, where there's the jurisdiction clause over

16     the contract --

17          THE COURT:  Please stop on that.  For that contract, I

18     can read, and I see that that's the jurisdiction clause, but I

19     thought the issue was the agreement that was or was not reached

20     sometime in 2013 between V&A -- the original agreement.  They

21     may be talking -- I don't really think Mr. Grossman's talking

22     about the validity or not of your agreement, other than the

23     fact that it was preceded by an agreement his client had

24     several years earlier regarding the same painting.  And so I

25     appreciate what you're saying; I know there's some discussion

K36KVAAM

1    about whether it's a loan or a sale, and that's not of as much

2    interest to me.

3            Do you dispute, or do you not have enough knowledge to

4    know, that there was a purchase by the plaintiff in this case

5    of a 50 percent interest in the Guiton painting that is at

6    issue?

7            MS. LINDSTROM:  Your Honor, I have no knowledge of

8    that contract, and my client had no knowledge of that contract.

9    And the first that I know that the plaintiff approached my

10   client were when they attempted to acquire it from Guzzini when

11   Mr. Grossman and his client went over to London to meet with my

12   client.  I was not present at that meeting, so I don't know --

13           THE COURT:  When, approximately -- of course, you

14   weren't present.  That's the part of your upsetment about it.

15           MS. LINDSTROM:  Yes.

16           THE COURT:  Tell me, please, when that meeting took

17   place.

18           MS. LINDSTROM:  I believe that was the end of January,

19   but -- as a matter of fact, I saw Mr. Grossman at the winter

20   show at the armory approximately two days before, and he never

21   mentioned to me that he would be flying to London and meeting

22   with my client.

23           THE COURT:  Okay.  All right.

24           Let me do this, please, let me please hear from

25   plaintiff's counsel, and then I'll hear again from you.  Thank

K36KVAAM

1   you.

2          Mr. Grossman, I had other questions for you, but she's

3   just raised a topic of interest.  So why don't you tell me, did

4   you, in fact, participate in a meeting in January with

5   representatives of the defendant?

6          MR. GROSSMAN:  I absolutely did, your Honor.  And I

7   have to tell you I feel like I'm kind of being set up here.

8   That meeting was set up between the principals requesting that

9   counsel from both sides be present.

10         THE COURT:  Please back up for those of us who were

11  not in attendance.

12         MR. GROSSMAN:  Sure.

13         THE COURT:  When, approximately, were these

14  discussions about setting up the meeting taking place?  In

15  December?  In January?

16         MR. GROSSMAN:  I don't know when the first discussions

17  occurred.  One of the principals of V&A Collection has been in

18  touch with a representative of Guzzini, the -- Lisa Reuben --

19  she's the daughter of either Simon or David Reuben, the Reuben

20  brothers -- since as early as October.  I wasn't involved at

21  that time.  Those discussions and subsequent discussions were

22  between the principals only.

23         THE COURT:  The principals only.

24         When were you made aware that these discussions were

25  taking place?  Contemporaneously with them taking place or

K36KVAAM

1    sometime thereafter?

2              MR. GROSSMAN:  Sometime thereafter.

3              THE COURT:  Do you have a recollection of what month

4    it might have been that you might have learned that these

5    discussions were taking place?

6              MR. GROSSMAN:  Probably as early as November.  Late

7    October/early November is my best recollection.

8              THE COURT:  Well, let's ask this:  Was there any

9    discussion about the situs of the painting at that time?  Where

10   it was located?

11             MR. GROSSMAN:  So I can -- discussions between me and

12   my client or between the principals?

13             THE COURT:  No, no, excuse me.  At the time they were

14   having these discussions, did anybody know the painting was

15   going to be moved on or about November 1st?

16             MR. GROSSMAN:  No.  In fact, until the end --

17             THE COURT:  No is a fine answer.

18             MR. GROSSMAN:  No.

19             THE COURT:  Thank you very much.

20             So, there were discussions in late 2019 about having a

21   meeting between the principals, yes?

22             MR. GROSSMAN:  I don't know if they were discussing

23   meeting at that point.

24             THE COURT:  Fair enough.

25             There were discussions about this painting?

K36KVAAM

       MR. GROSSMAN:  There were ongoing discussions between the principals on how to resolve these competing title claims, yes.

       THE COURT:  Understood.

       At some point, somebody said, let's meet?

       MR. GROSSMAN:  At some point, there were phone conversations and text messages between the principals saying, let's meet with the lawyers in London, correct.

       THE COURT:  Am I correct that you did not instigate either the conversations or the text messages?

       MR. GROSSMAN:  You are correct, absolutely.

       THE COURT:  Were you involved at the time that they were taking place?  I thought I heard you say that you came to the case a little bit later.

       MR. GROSSMAN:  I came to represent this client, V&A Collection, a little bit later.  We represent another claimant in the pending Guzzini case, SAT Finance.

       THE COURT:  SAT Finance.  Thank you.  Fair enough.

       SAT Finance does not have common owners, directors, principals, with V&A?

       MR. GROSSMAN:  No relationship at all.

       THE COURT:  Thank you.

       So V&A and Guzzini principals were talking, and eventually they talked about meeting?

       MR. GROSSMAN:  Correct.

K36KVAAM

1          THE COURT:  And eventually they met?

2          MR. GROSSMAN:  Correct.

3          THE COURT:  You were invited -- the understanding you

4     had was that both attorneys were being invited to come?

5          MR. GROSSMAN:  I've seen the text message exchange

6     from the other side confirming that a meeting with lawyers will

7     take place at Guzzini's office in London, correct.

8          THE COURT:  When did this meeting take place?

9          MR. GROSSMAN:  January 28th, I believe, or 29th, but I

10    believe it was the 28th.

11          THE COURT:  Okay.  And you went?

12          MR. GROSSMAN:  I went.

13          THE COURT:  And a principal from your client went?

14          MR. GROSSMAN:  Correct.

15          THE COURT:  And it was Guzzini's offices, so there was

16    someone from Guzzini there?

17          MR. GROSSMAN:  There was -- Lisa Reuben was there, one

18    of her advisors from Guzzini was there, and then someone was on

19    the phone.

20          THE COURT:  How does she spell her last name, please?

21          MR. GROSSMAN:  Lisa Reuben?

22          THE COURT:  Yes, please.

23          MR. GROSSMAN:  I believe it's R-e-u-b-e-n.

24          THE COURT:  Thank you.  I wanted to be sure.  There

25    are different spellings.

K36KVAAM

1          Were you surprised when there was no attorney present

2     for Guzzini?

3          MR. GROSSMAN:  I was very surprised.

4          THE COURT:  Did you comment to anyone about there

5     being no presence -- no attorneys present?

6          MR. GROSSMAN:  Absolutely.  We walked into the room,

7     after we were announced.  The first I was told that their

8     lawyers wouldn't be present is as I walked into the room.

9          THE COURT:  Who told you -- a Reuben or someone else?

10          MR. GROSSMAN:  Lisa Reuben.

11          THE COURT:  Lisa Reuben, okay.

12          MR. GROSSMAN:  She said I called my lawyers and told

13     them not to come to the meeting.

14          THE COURT:  Okay.  Just because there's a lot of

15     gesticulating going on behind you right now, which they know is

16     inappropriate and it's really distracting, can I just

17     understand that you're making statements to me as an officer of

18     the court, recognizing the full panoply of sanctions I have

19     available if it turns out you're lying to me?  I just want to

20     get that out there.  Yes?

21          MR. GROSSMAN:  Of course, your Honor.

22          THE COURT:  All right.  Thank you.

23          So you stayed at the meeting?

24          MR. GROSSMAN:  I stayed at the meeting.

25          THE COURT:  All right.  The meeting didn't resolve

K36KVAAM

1    anything?

2            MR. GROSSMAN:  No.

3            THE COURT:  Because here we are.

4            MR. GROSSMAN:  That's right.

5            But I want to be very clear, and as I know the Court

6    does, I couldn't take more seriously those ethical obligations

7    and responsibilities.  That meeting was conducted with the

8    understanding, both based on writings that I saw and statements

9    from Guzzini's principal, that that meeting was taking place

10   with her lawyers' knowledge and consent.  I --

11           THE COURT:  Let me make sure how you deduced that.

12   First of all, you saw the text messages or the written

13   communications regarding lawyers being present.  When you were

14   told by Ms. Reuben that she had told her lawyer to stay home,

15   you understood that her lawyer, nonetheless, was aware of the

16   meeting because she was being told to stay home from the

17   meeting?

18           MR. GROSSMAN:  Well, of course.

19           THE COURT:  Okay.  I'm just checking.  That's fine.

20           MR. GROSSMAN:  Absolutely.

21           THE COURT:  I need to connect the dots.

22           MR. GROSSMAN:  If I can finish it, because, again, of

23   course, I take this very seriously.

24           THE COURT:  Yes, of course.

25           MR. GROSSMAN:  The following day, I reached out -- at

K36KVAAM

1   the conclusion of that meeting, at Ms. Reuben's suggestion, the

2   following day, I reached out to Ms. Lindstrom about that

3   meeting to discuss next steps relating to that meeting.  It was

4   never an intention to have that meeting unbeknownst to them or

5   Ms. Reuben's other lawyers in London.  I wasn't sure which

6   lawyers were going to be there, but the point is, at every

7   step, my understanding, based on all that information and

8   representations to me, was that that meeting was conducted with

9   Guzzini's lawyers' knowledge and consent.

10          THE COURT:  All right.

11          The day may come when I may want to see the text

12   messages, but we're not there yet.

13          I began with your adversary, because the case came to

14   me by means of removal.  I also began with your adversary

15   because I wanted to know where the painting was.  Now, I do.

16   Now you know as well.

17          MR. GROSSMAN:  Now we do.

18          THE COURT:  Does that not moot one of your requests to

19   me?  We know where it is, and she's represented to me they're

20   not moving it, at least in the near term.  So isn't that enough

21   for that?

22          MR. GROSSMAN:  I think so, your Honor.  The only

23   reason we're here is because at that same February 19th

24   conference, on the record, I suggested to the court, I said, I

25   don't mean to mince words -- and this is at page 15 --

K36KVAAM

1    THE COURT:  One moment, please, while I get to page

2    15.  Yes?

3    MR. GROSSMAN:  -- line 18 -- when representations were

4    made by Guzzini's counsel that they no longer owned the work

5    and that it had been transferred, I pointed out, not physically

6    being in control of something is very different than not having

7    custody or control; for all we know, this may have been

8    transferred to an affiliate, and the timing.

9    THE COURT:  Yes.  But, of course, she told me it was

10   not transferred to an affiliate, it was transferred to someone

11   with a common director.  And on the next page, Mr. Lerner is

12   asked the question -- Mr. Lerner enjoys being spoken about in

13   the third person even though he's here in the courtroom -- he

14   is representing that Guzzini is not in a position to transfer,

15   sell, pledge, assign, or otherwise dispose of this painting.

16   He responds:  "It's out of its possession and control."  And

17   then he -- I guess his invocation of "in God we trust" is his

18   way of suggesting that he means this very seriously and is

19   taking this in the same way I asked you as an officer of the

20   court.  So I think we have the analogue there.

21   MR. GROSSMAN:  Yes.

22   THE COURT:  All right.  So you are surprised, and

23   that's fine.

24   But today, you and I now know where it is --

25   MR. GROSSMAN:  Right.

K36KVAAM

1              THE COURT:  -- who it's with, that it's in storage,

2      and that today, it's not going anywhere else, and it's not

3      hanging on anyone's mantel or on the wall of this courtroom.

4      So that answers, I think, some of the questions.

5              It doesn't answer other questions, of course, about

6      whose painting it is, do I have jurisdiction over Guzzini,

7      things of that nature.  But that thing is resolved, yes?

8              MR. GROSSMAN:  Yes, your Honor.  If those

9      representations had been made on the 19th, we wouldn't be here

10     today.

11             THE COURT:  I know, but it's lovely to meet everyone.

12             MR. GROSSMAN:  Yes, I agree.

13             THE COURT:  So now we're on the other issue, which is

14     substitute of service now.  I'm intuiting, from Ms. Lindstrom's

15     comment, they're not accepting service even -- and I

16     understand, because I understand the law in this area, too,

17     that it would be difficult for Guzzini to argue that it doesn't

18     have notice.  But I haven't given an opportunity, a fair

19     opportunity, for Ms. Lindstrom and Mr. Lerner to speak to the

20     issue of why substitute service is inappropriate here, and it

21     would be the fairest thing, given that we know where the

22     painting is, to allow them to write on the issue, but you've

23     begun the Hague Convention process, yes?

24             MR. GROSSMAN:  Yes.

25             THE COURT:  Okay.

K36KVAAM

1          Now, assuming, as one hopes, that that works, I'm told

2     I lack personal jurisdiction over Guzzini, and I might -- who

3     knows, I might even lack other types of jurisdiction.  Tell me,

4     please, what is it about the original dealings between your

5     client and Mr. Philbrick that make you believe that this Court

6     or this state is the right place to bring this claim?

7          MR. GROSSMAN:  Yes, sure.  Our jurisdictional

8     argument, your Honor, in the first instance is based on waiver

9     and consent.  It's based on waiver and consent because in the

10    complaint they filed in state court, paragraphs 4 and 5 --

11         THE COURT:  One moment.  That complaint they filed in

12    state court was for another painting, right?  It's in the

13    same -- you would say it's one of three in the same

14    transaction, but it is a different painting, yes?

15         MR. GROSSMAN:  It's a different painting.

16         THE COURT:  Okay, fine.  Go ahead.

17         MR. GROSSMAN:  The rights that they are asserting to

18    that painting derive from the very same contract that is the

19    basis of their ownership claim over the Guiton painting at

20    issue in this case, and that's at paragraphs 4 and 5 of their

21    complaint, where they say the three works -- that includes the

22    Guiton -- were purchased under that June 28, 2017 agreement.

23         So our primary argument for jurisdiction -- and if the

24    Court would like us to brief it, we can, but we do have some

25    cites supporting --

K36KVAAM

1          THE COURT:  Excuse me for stopping you.  The day will

2     come when you'll have to brief it, but I suspect we've got an

3     antecedent issue of how to get them served.  They're not

4     accepting service yet.  I'm not, today, going to argue or order

5     substituted service, although I understand your arguments in

6     favor of that, I get those.  I just need to hear something from

7     them, and I'll then decide.

8          But I appreciate that I've managed to get us started a

9     few steps ahead talking about personal jurisdiction.  I think

10    it's in response to things I've heard.  I actually would like

11    to go back a little bit further.

12         The 2013 transaction, tell me, please, about it.  I

13    know you've spoken about it in your complaint, which I've read,

14    but I want to make sure I understand it.  So where did that

15    transaction take place?

16         MR. GROSSMAN:  V&A Collection is based in New York.

17         THE COURT:  They are?  Okay.

18         MR. GROSSMAN:  Yes.

19         THE COURT:  Good to know.  Okay.

20         MR. GROSSMAN:  And it's Mr. Sakhai's --

21         THE COURT:  One moment, please.

22         Go ahead.

23         MR. GROSSMAN:  Exhibit 4 to Mr. Sakhai's affidavit --

24    I'm sorry, to our declaration.

25         THE COURT:  That is Mr. Sakhai's affidavit, yes.

K36KVAAM

1            MR. GROSSMAN:  That is correct.  It's page 18 of that

2    document, 18 on the bottom right.  That is a July 1st, 2013

3    invoice from V&A Gallery, with the address at the bottom of

4    that invoice, it says, "Great network invoiced to Modern

5    Collections."

6            THE COURT:  Okay.

7            Modern Collections, located in London, yes?  They

8    don't have a New York office?

9            MR. GROSSMAN:  Correct.  To my knowledge, they don't.

10           THE COURT:  Okay.  I see.

11           MR. GROSSMAN:  And -- I'm sorry.

12           THE COURT:  No, no, go ahead.  I'll let you continue.

13           So this transaction, if it took place -- and, again,

14   I'm not making any findings, I just want to understand the

15   factual underpinnings for this -- in or about 2013, July of

16   2013, your client entered into a transaction with Modern

17   Collections.  They gave up another Guiton, they paid $350,000,

18   and they got this painting -- half ownership of this painting,

19   yes?

20           MR. GROSSMAN:  They gave up their interest in the

21   other Guiton, the Guiton X work --

22           THE COURT:  Yes, okay.

23           MR. GROSSMAN:  -- in exchange for 50 percent interest

24   in this work plus 350,000 cash.  The money was to come our

25   direction, not the other way around.

K36KVAAM

1    THE COURT:  Excuse me, that was confusing to me.

2    Okay.

3    MR. GROSSMAN:  Which is reflected in the invoice

4    issued by V&A Gallery to Philbrick.

5    THE COURT:  Thank you.  I understand that.

6    One thing that was a little bit confusing to me, about

7    two-thirds of the way down the page, there is a parenthetical

8    that indicates that this is in lieu of payment for $1,200,000,

9    previous invoice attached.  Is it the case -- and you will

10   please excuse me if I'm misunderstanding this because I've only

11   had the case for a couple of days -- your client owned the X

12   painting?

13   MR. GROSSMAN:  Yes.

14   THE COURT:  Sold it to Mr. Philbrick, or attempted to

15   sell it to him?  No?

16   MR. GROSSMAN:  It's to Modern Collections.

17   THE COURT:  Yes, excuse me, to Modern Collections.

18   MR. GROSSMAN:  So they effectively traded their

19   ownership interest of the Guiton X work in exchange for a

20   50 percent interest in a more valuable work, which is the

21   Guiton U at issue in this case.

22   THE COURT:  Yes, fair enough.

23   It's the million two figure that I'm having difficulty

24   understanding.  At some point, did someone pay a million two

25   for that painting?

K36KVAAM

| 1 | MR. GROSSMAN:  No, your Honor.  I believe, I believe |

1              MR. GROSSMAN:  No, your Honor.  I believe, I believe

2       that that was the value being ascribed to that work.

3              THE COURT:  Thank you.  That's what I needed to

4       understand.  Okay.

5              This is all coming from judicial envy, because no one

6       is paying me anywhere near that for the work that I do, but I

7       get that now.

8              So they had a painting, they went from X to you, as it

9       were, but I believe your adversaries have suggested, in the

10       litigation before Judge Cohen, that there are a number of

11       lawsuits pending in London regarding Mr. Philbrick and his

12       dealings.

13              First of all, I believe that is what they said.  Do

14       you agree?  Are there litigations pending in London?  Are there

15       other disgruntled customers?

16              MR. GROSSMAN:  Oh, there are any number.

17              THE COURT:  Okay.

18              So, is your client suing Philbrick?

19              MR. GROSSMAN:  We have not sued Philbrick.

20              THE COURT:  Is there a reason why you're going after

21       Guzzini and not Philbrick?

22              MR. GROSSMAN:  We're going after the painting, your

23       Honor.

24              THE COURT:  Got it.

25              So this is your version of the in rem action?

K36KVAAM

1          MR. GROSSMAN:  That's right.  Initially, it was a

2     replevin case, your Honor.  Once we learned of the purported

3     transfer, we amended it to a conversion claim.  To be clear,

4     that's not to say we won't go after Philbrick.  Philbrick is on

5     the run right now.  Nobody knows where he is.  He's being

6     investigated by authorities here and abroad.

7          THE COURT:  So much more interesting than my life.

8          MR. GROSSMAN:  We can chase him forever, we can chase

9     a judgment against him -- I don't know that that would be worth

10    anything -- but there's no question, and I think everybody will

11    or should agree, that Philbrick is ultimately the one

12    responsible for this massive mess we're in right now.

13         THE COURT:  Where is the X painting right now?

14         MR. GROSSMAN:  I don't know.  That was sold to

15    Philbrick or Modern Collections back in 2013.  I don't know

16    where it is.

17         THE COURT:  So it's not even as though you could get

18    the X back and they can keep the U.  That would be a great

19    resolution, but it's not happening.

20         For the moment, because this is our initial

21    conference, I will hear from you on anything you want to tell

22    me, but there were really two issues to address today, and the

23    biggest was the discovery issue, which I have the answers I

24    needed for that, and then the second is the service issue,

25    which I will hear from Ms. Lindstrom, but I suspect I'm going

K36KVAAM

1  to need to hear in writing as well.

2           Are there other things you want to call to my

3  attention?

4           MR. GROSSMAN:  Well, I think, your Honor, quite

5  frankly, in light of the representations by Guzzini that the

6  work will not be transferred, moved, sold, or otherwise

7  disposed of, we're --

8           THE COURT:  One moment, please.

9           Do I still have that, Ms. Lindstrom?

10          MS. LINDSTROM:  You have that representation from me,

11  but not from Guzzini.  And I will call the principal at

12  Guzzini, who's a director at Lanark, and let him know that, and

13  I am very certain that that will be abided by.  That's a

14  representation from Wendy Lindstrom.

15          THE COURT:  Very fair.

16          Could I have a written submission from you next week,

17  documenting that you have obtained from your client that

18  representation?

19          MS. LINDSTROM:  Yes, your Honor, no problem.

20          THE COURT:  Okay, fine.

21          MR. GROSSMAN:  So my point is, in light of that

22  representation, the need for substituted service, at least for

23  present purposes --

24          THE COURT:  Agreed.

25          MR. GROSSMAN:  -- I think is obviated.  We were trying

K36KVAAM

1    to hurry up to get this information that we now have.

2               THE COURT:  Well, I'm with you.  I'd like to see the

3    Hague Convention work its magic and not have either of you

4    expend further resources in a motion that I cannot say is a

5    sure thing.

6               So, does that mean today we're done -- although I do

7    want to hear from the back table -- and it's just a question of

8    what happens once they get served?

9               MR. GROSSMAN:  I think that's right, your Honor.

10              THE COURT:  Okay.

11              What, if anything, will you be doing in Judge Cohen's

12   action?

13              MR. GROSSMAN:  With regards to this painting?

14              THE COURT:  With regards to anything.  Are you just

15   showing up as someone who has a peripheral interest in what's

16   going on in that cases?  Because if I understood correctly, the

17   idea was to have the two cases going in tandem, and now they're

18   not.

19              MR. GROSSMAN:  Well, your Honor, quite frankly, we

20   approached it that way, in the first instance, for the ease of

21   all the parties where those issues were being litigated.  At

22   Justice Cohen's directive, we filed a separate lawsuit, which

23   he would then coordinate.  We were in court following that

24   filing.  We met with his staff in chambers.  It was only

25   because of a scheduling conflict that he asked us to come back

K36KVAAM

1    that Monday, and it was that Friday night that we were removed.

2    Not that we don't want to be here, your Honor, but we think it

3    makes a lot of sense for these issues arising out of the same

4    contracts to be adjudicated together with the proceeding that

5    was filed in state court.

6            THE COURT:  I don't have the -- you can't remove that

7    one.

8            MR. GROSSMAN:  That's right.  But we could, your

9    Honor, ask Justice Cohen, in light of these developments, to

10   reconsider the motion to intervene.  He didn't deny it, he just

11   didn't sign the order to show cause and asked us to proceed

12   differently.

13           THE COURT:  I will give you no advice on that point,

14   but someone will tell me how that works out.

15           Other things you'd like me to know, sir?

16           MR. GROSSMAN:  I'd like to just, because it was raised

17   before, point out one issue under the contract --

18           THE COURT:  Which contract, sir?  Theirs?

19           MR. GROSSMAN:  Their contract.

20           THE COURT:  Okay.  That they say is a sale agreement

21   and you say is a loan?

22           MR. GROSSMAN:  That's right, your Honor.

23           THE COURT:  I'm looking at it right now, sir.

24           MR. GROSSMAN:  The only point I'll make in that

25   regard, though we have more, relates to what we've heard about

K36KVAAM

1    the purchase price.  There was a $6 million payment made.  If

2    you look at the schedule of artworks, the combined insurance

3    value of these three works, including the work at issue here,

4    was $25 million.  You can call something an agreement anything

5    you want, but at its essence, for any number of reasons, but

6    that purchase price being the most significant, this was not a

7    good-faith purchase for value, which, under U.K. law, we

8    understand to be almost identical to the U.C.C. framework here.

9            THE COURT:  I understand the argument.  Thank you very

10   much.

11           MR. GROSSMAN:  Thank you, your Honor.

12           THE COURT:  Excuse me.  Mr. Grossman, lest I forget,

13   when this proceeding is done, could you please arrange to

14   obtain a transcript in the ordinary course?

15           MR. GROSSMAN:  Of course.

16           THE COURT:  If you order it, I'll receive it

17   automatically, but there's been a lot spoken today, and I do

18   want to have it for my records.

19           MR. GROSSMAN:  Very good.  Thank you, your Honor.

20           THE COURT:  Thank you so much.

21           Ms. Lindstrom, your discussions with me may be a bit

22   shorter now, given the conversation I've had with Mr. Grossman,

23   but I'll hear from you.  It sounds like we can let the Hague

24   Convention proceed as it does, and when your client is served,

25   in all likelihood, you'll be representing them, and then you

K36KVAAM

1    can come back and tell me what's going on, but I'll hear from

2    you on anything else you want to be heard on.

3              MS. LINDSTROM:  Thank you, your Honor.

4              The first thing that came to mind when counsel was

5    speaking about the contract:  I just want to make it clear that

6    it's our view that this contract has no bearing on V&A, this

7    plaintiff, and this action.  It's unrelated, which is why I

8    wanted -- which is why I tactically decided on Friday night to

9    remove the case to federal court, because I wanted a fresh set

10   of eyes on it, separate of the dispute that does involve the

11   contract in New York Supreme.

12             And, then, since you had asked counsel if there was

13   anything else that he wanted to call to your attention, there's

14   one other thing I do want to call to your attention because I'm

15   just so frustrated over what went on.

16             THE COURT:  Yes.

17             MS. LINDSTROM:  Counsel, during that meeting with my

18   client, asked my client why I was chosen to be their lawyer and

19   then made a comment insinuating that I was an insurance lawyer,

20   which certainly --

21             THE COURT:  What does that mean?

22             MS. LINDSTROM:  That's what I want to know, your

23   Honor.

24             THE COURT:  No, no.

25             By the way, and apropos of nothing, I'm married to an

K36KVAAM

1   insurance lawyer, but I think of it as someone who handles

2   coverage disputes, which I don't think you do.

3          MS. LINDSTROM:  Your Honor, we do, actually, and we do

4   have a very prolific insurance practice, which I am very happy

5   to have, but, that being said, the sentiment, that at least my

6   client told me, was to try and undermine my ability to be -- to

7   practice in the area of art law, and I think that's important

8   to tell the Court, that this is -- there's a lot going on here

9   that we want the Court to be aware of.

10          And then we find a lot of the activities involving his

11   client in this matter and in other matters suspicious, and we

12   wanted to have two separate sets of eyes on it.  It was

13   certainly nothing untoward, we certainly want to have

14   transparency, and we wanted to work with the Court to resolve

15   these, but the bottom line is, it's our view that there is no

16   connection between V&A and this contract, there's no connection

17   whatsoever between V&A and the Stengel and the other state law

18   in the state court case, and there's absolutely no connection

19   over Guzzini here.  Guzzini did not avail itself of the courts

20   in the State of New York.  They weren't doing business in the

21   State of New York.  There's all kinds of jurisdictional

22   arguments that we'd like to brief here.

23          The action was designed as an in rem proceeding

24   because in addition to insurance law, which I love, I practice

25   admiralty law, and I thought that would be a smart vehicle to

K36KVAAM

1    go after the work of art, which my client put on consignment

2    with Christie's.  Everything in the state court action is

3    designed around my client's contact with Christie's for that

4    one sale.  But there's no general or specific jurisdiction in

5    this court that involves the Guiton in any way.

6          So it's our view that the state court can adjudicate

7    that in rem action, which I may have even removed to federal

8    court or placed in federal court originally because being from

9    an admiralty background, I do practice a lot in federal court,

10   but I would have put it in, but I didn't see any real

11   jurisdiction under admiralty jurisdiction or federal question

12   to do that at first.  But when I had the opportunity, which I

13   thought of on Friday afternoon, to move this to federal court,

14   I thought it would be a good tactical decision to get a fresh

15   set of eyes on this Guiton case and to put a little distance

16   between the Stengel and the Guiton because they're completely

17   unrelated.

18         THE COURT:  Okay.

19         Anything else?  I'm sorry, Ms. Lindstrom, anything

20   else?

21         MS. LINDSTROM:  Oh, no, your Honor, that's all.  Thank

22   you.

23         THE COURT:  Mr. Lerner, do you want to be heard on

24   anything, sir?

25         MR. LERNER:  You'll hear me on paper.

K36KVAAM

1        THE COURT:  Okay.  Thank you very much.

2        And, Ms. Hogan, everybody gets to talk here.  Anything

3   you'd like to add?

4        MS. HOGAN:  No, your Honor.

5        THE COURT:  Okay.

6        It sounds like I'll hear from you when Guzzini is

7   served per the Hague Convention.  If at any time you want to

8   come in earlier, you'll let me know.  You know how to reach me.

9   Please tell your client's director not to dispose of the

10  painting because we'll all be very sad.  And -- all right.

11  Thank you very much.  I will see you --

12        MR. LERNER:  Your Honor, one other thing?

13        THE COURT:  Yes, sir.

14        MR. LERNER:  On the form, the civil cover sheet, I

15  indicated Guzzini's registered address in the British Virgin

16  Islands.  I think V&A's counsel can just look at that cover

17  sheet and see the most efficient way, a place to serve Guzzini.

18        THE COURT:  I see.

19        MR. LERNER:  It shouldn't be a heavy lift.

20        MR. GROSSMAN:  We've done that as well, your Honor.

21        THE COURT:  He's -- I won't say one step ahead of you.

22  He is walking hand in hand with you.

23        All right.  Thank you very much.  Have a great

24  weekend.

25        COUNSEL:  Thank you, your Honor.  * * *